# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: **6: 12-cv-00002** |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| **LIFE PARTNERS HOLDINGS, INC., BRIAN D.** | : | |
| **PARDO, R. SCOTT PEDEN, AND** | : | |
| **DAVID M. MARTIN,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.      Since 2006, Defendants Life Partners Holdings, Inc. (referred to jointly with its wholly-owned subsidiary, Life Partners, Inc. as "Life Partners" or the "Company")—through senior officers Brian D. Pardo ("Pardo"), R. Scott Peden ("Peden"), and, since 2008, David Martin ("Martin")—engaged in a disclosure and accounting fraud that misled the Company's shareholders about the sustainability of Life Partners' revenues and profit margins, consumer demand for the life settlement investments that the Company brokers, and, since at least fiscal year 2007, the Company's net income.  Pardo and Peden profited from the fraud by trading on inside information that Life Partners systematically uses life expectancy estimates that the Company knows to be materially short in brokering life settlements.  Life Partners engaged in this practice to artificially inflate the Company's revenues and profit margins.  Pardo and Peden knew the Company engaged in this practice, which Defendants concealed from shareholders, and took advantage of the non-public information to sell shares of Life Partners common stock at artificially inflated prices.

2.      Life Partners is a public company that trades on the NASDAQ under the ticker symbol "LPHI."   The Company is in the business of brokering life settlements.   In a life settlement transaction, a life insurance policy owner sells the policy to a purchaser, and the purchaser becomes an "investor" in the sense that the purchaser receives the death benefit when the policy matures (*i.e.,* the insured dies).   The purchaser makes a lump-sum payment in exchange for the policy, and assumes responsibility for paying premiums on the policy until maturity.

3.      Life Partners derives revenue from the life settlement transactions it brokers by keeping the difference between what investors pay to acquire a policy and what the policy owner receives from the sale.   In a typical life settlement transaction, Life Partners identifies a number of investors who purchase fractional interests in a given policy.   Included in the purchase price that investors pay are funds sufficient to cover future premium payments necessary to maintain the policy during the insured's estimated life expectancy, which funds Life Partners places in escrow.   Life Partners captures as revenue the difference between the purchase and sale prices, minus the escrowed funds and certain transaction costs.   If the insured under the policy outlives the life expectancy estimate that Life Partners assigns to the policy, investors have a continuing obligation to pay premiums after the escrowed funds are depleted.   Otherwise, the policy would lapse, and investors would lose their entire investment.

4.      In a life settlement transaction, the estimate of an insured's life expectancy ("LE") is a critical factor in determining the purchase price that investors are willing to pay.   Investors will pay more to acquire life settlements that have shorter LEs, as they receive their fractional interest in the death benefit sooner, and the anticipated period of time during which they have to make premium payments to maintain the policy is shorter.   Accordingly, because Life Partners'

revenue model is predicated on capturing the spread between the price investors are willing to pay for a life settlement and the amount paid to the policy seller, the LEs that Life Partners uses to broker life settlements are critical to the Company's revenues and profit margins. The shorter the LE, the greater the spread between the purchase and sale prices. Thus, LEs are not only critically important to investors in life settlement policies, but also to Life Partners and its shareholders.

5.      Despite the importance of reliable LEs to both investors and shareholders, Life Partners has, since at least 1999, systematically used materially underestimated LEs in order to inflate its revenues. Prior to 1999, Life Partners obtained the LEs that it used to broker life settlements from Dr. Jack Kelly ("Kelly")—a Reno, Nevada-based doctor that, as a founder and part owner of the Company, had a financial interest in Life Partners, Inc. Following Kelly's unexpected death in 1999—Pardo immediately hired Kelly's officemate, Dr. Donald Cassidy ("Cassidy"), to render Life Partners' LEs.

6.      Prior to hiring Cassidy, Life Partners and Pardo did not conduct any meaningful due diligence on Cassidy's qualifications to act as a life expectancy underwriter. In fact, during their only conversation (at Kelly's funeral), Pardo instructed Cassidy to review Kelly's life expectancy assessments to determine "how they were doing it." Within a few days of Kelly's funeral, Life Partners began sending all of its retail life expectancy work to Cassidy, paying him $500 for each policy Life Partners successfully brokered using the LEs that Cassidy provided. In February 2008, Life Partners began paying Cassidy an additional $15,000 per month.

7.      Prior to being hired by Life Partners, Cassidy had no experience rendering LEs. He had no actuarial training. As of February 8, 2011, Cassidy had never researched the

methodology used by life settlement underwriters.  In fact, in the ten-plus years he has worked for Life Partners, Cassidy never modified his methodology or evaluated his track record on LEs.

8.      By at least fiscal year 2006, it was obvious to Life Partners, Pardo, and Peden the extent to which Cassidy, utilizing the Kelly methodology, had delivered to Life Partners systematically and materially underestimated LEs.  Specifically, as of February 28, 2006, Pardo and Peden knew or were reckless in not knowing that 88% of the relevant policies brokered by Life Partners had exceeded their Cassidy–rendered LE.  By February 28, 2009, Life Partners, Pardo, Peden and Martin knew or were reckless in not knowing that 90% of the relevant policies brokered by the Company had exceeded their Cassidy-rendered LE.

9.      In fact, in 2007, the Colorado Securities Commission sued Life Partners, Pardo, and Peden for, among other things, failing to disclose to investors the "high frequency rate" at which insureds outlive the LEs that Life Partners assigns to the policies underlying its life settlement transactions.  Life Partners paid $12.8 million to settle the Colorado action.  The settlement required the Company, at the option of investors, to acquire the interests the Company had brokered to them and refund the purchase price.

10.     Despite their awareness of Life Partners' practice of systematically using materially short LEs to broker life settlements, Defendants misrepresented in the Company's public filings with the Commission between 2006 and 2011 that the underestimation of LEs was a contingent risk.  Defendants' misrepresentation of an existing reality—systematically and materially underestimated LEs—as a contingent risk left shareholders with the false and misleading impression that the Company could continue to capture the profit margins that it had historically realized.  In the same public filings, Life Partners also failed to disclose that the

underestimated LEs constituted a material trend impacting the Company's revenues, as required by the federal securities laws.

11.     Pardo, Peden and Martin's awareness of the LE fraud is evidenced by, among other things, their efforts to conceal it.  During quarterly conference calls with shareholders and investors in 2007 and 2008, Pardo lied about Life Partners' track record as delivering "double-digit" returns to investors.  When Pardo touted these returns, he knew that the purported "double-digit" returns did not include approximately 2,900 life settlements for which the insured had already outlived Life Partners' LE.  In fact, Pardo knew that the double-digit returns were impossible to achieve even under a "best case scenario"—*i.e.*, were all the insureds who had reached their life expectancy estimate to die as of the dates of his statements during the conference calls.

12.     Peden further concealed Life Partners' LE fraud by misrepresenting that Cassidy's methodology was consistent with industry practices.  In particular, in October and November 2008, Peden misrepresented to an investor, as well as a member of the network of independent buyers' agents that Life Partners uses to identify investors, that Cassidy used the 2008 Valuation Basic Table ("VBT") in rendering LEs for use by Life Partners.  When he made these false statements, Peden knew that Cassidy used a census table, not the VBT.  And, unlike the VBT, the census table that Cassidy used to estimate LEs contains data that was not limited to persons who had been underwritten for life insurance, but rather included the entire U.S. population.  Cassidy's use of the census table deviated from industry practices for life settlement underwriting.

13.     Finally, in August 2010, Peden and Martin, in an effort to cover up the LE fraud and convince Life Partners' auditor that Cassidy's LEs were reliable, provided the auditor with a

spreadsheet of the 300 "most recent" maturities.  Notably, the spreadsheet included both viatical and life settlement policies dating back to fiscal year 2000, but it excluded 1,230 policies for which insureds had outlived Cassidy LEs.  Peden and Martin knew that consideration of these 1,230 policies by the auditor would have been essential to an accurate assessment of Cassidy's track record, and they intentionally excluded these policies to mislead the auditor.

14.     Between February 2007 and January 2009, Pardo and Peden sold approximately $11.5 million and $300,000, respectively, of Life Partners common stock based on material, non-public information that the Company's stock price was dependant on its practice of systematically using materially short LEs to generate revenues.

15.     During the same time period that the Defendants were misleading shareholders about risks to Life Partners' business and investor returns, they also engaged in an accounting fraud.  From at least fiscal year 2007 through the third quarter of fiscal year 2011, Life Partners materially misstated its net income by prematurely recognizing revenue from life settlement transactions that had not yet been completed.  Additionally, Pardo, Peden and Martin knew or were reckless in not knowing that it was Life Partners' practice to conceal improper revenue recognition practices from it the Company's auditor by backdating transactional documents for the life settlements the Company brokered.

16.     From at least fiscal year 2009, Defendants also misstated net income by failing to appropriately impair life settlement policies owned by Life Partners.  Despite their awareness that the Company's LEs were materially short, Defendants continued to use those LEs to value policies that the Company held on its own books, thereby artificially inflating the value of the policies in Life Partners' financial statements.

17.     As a result of Life Partners' practice of prematurely recognizing revenue and failing to appropriately impair its own investments in life settlements, Defendants materially misstated net income from at least fiscal year 2007 through the third quarter of fiscal year 2011. On November 22, 2011, Life Partners restated its financial results for fiscal years 2007 through 2010, and for the first three quarters of fiscal year 2011, to correct errors related to revenue recognition, impairment of investments in owned policies, accrued liabilities, and the related tax impact, which the Company admitted had been previously "incorrectly accounted for under [GAAP]."

18.     The Commission, in the interest of protecting the public from such fraudulent activities, brings this civil securities law enforcement action seeking a permanent injunction against Life Partners, Pardo, Peden, and Martin, enjoining them from committing or aiding and abetting further violations of the federal securities laws.  The Commission also seeks an order barring the individual Defendants from serving as officers or directors of a public Company, and imposing disgorgement of ill-gotten gains, plus prejudgment interest, and civil monetary penalties as allowed by law.  The Commission further seeks an order requiring Pardo and Martin to reimburse Life Partners for bonuses and profits realized from sales of Life Partners securities during time periods for which the Company had materially misstated its financial results.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action under Sections 20(b), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77u(a)] and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(e) and 78aa].

20.     Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

21.     Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C. §77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa] because certain of the acts and transactions described herein took place in Waco, Texas, where the Company is headquartered.

## DEFENDANTS

22.     Life Partners Holdings, Inc. is a Texas corporation headquartered in Waco, Texas. The Company operates through a wholly-owned subsidiary, Life Partners, Inc.  Life Partners' common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, and the Company is subject to the reporting requirements of the Exchange Act.  Since 2000, Life Partners common stock has traded on the NASDAQ exchange under the ticker symbol "LPHI." Life Partners' fiscal year ends on the last day of February.

23.     Brian D. Pardo, age 69, is Director, President and CEO of Life Partners Holdings, Inc. and the founder and CEO of Life Partners, Inc.  According to a Schedule 14A Proxy Statement filed by the Company on June 25, 2010, Pardo directly and indirectly owns 50.3% of Life Partners Holdings, Inc.  In July 1989, the Commission filed a complaint against Pardo and his company, ASK Corp. of Waco, Texas, alleging that they materially overstated the company's revenues and profits in public filings.  Pardo resolved the enforcement action by consenting to the entry of a permanent injunction enjoining him from future violations of Exchange Act anti-fraud provisions and from aiding and abetting Exchange Act reporting violations.

24.     R. Scott Peden, age 47, has served as Director, General Counsel, Secretary and President of Life Partners Holdings, Inc. since 2000.  Since its incorporation in 1991, Peden has served as Vice President and General Counsel of Life Partners, Inc.  Peden is an attorney and has been licensed to practice in Texas since 1990.

25.     David M. Martin, age 53, has served as the Chief Financial Officer for Life Partners Holdings, Inc. since February 2008.  Martin is a Certified Public Accountant, licensed in Texas since 1984.

## FACTS

### FRAUDULENT AND MISLEADING REPRESENTATIONS TO SHAREHOLDERS

A. *Life Partners' Business Model*

26.     Life Partners, through its wholly-owned operating subsidiary, brokers the sale of life insurance policies by policy owners (typically the insureds under the policies) to investors in the secondary market, a transaction referred to as a "life settlement."  In general, Life Partners purports to distinguish between "viaticals" and "senior life settlements" based on whether or not the insured covered under the policy is terminally ill or elderly.  In the former case, it categorizes the policies as viaticals, and, in the latter, as senior life settlements.  Life Partners refers to senior life settlements and viaticals collectively as "life settlements."

27.     The Company's revenue model is designed to capture the residual monies in the life settlement transactions it brokers (*i.e.,* the difference between the buy and sale prices of the insurance policy, minus transactional costs).

28.     Life Partners facilitates sales of fractionalized interests in a single policy to multiple investors, a structure the Company refers to as "direct fractional ownership."  At the date investors purchase an interest in a policy, they also contribute funds to escrow for future

premium payments on the policy for the term of the life expectancy estimate provided by Life Partners. The escrowed amount, as well as a 12% commission paid to the investor's broker and medical review fees, are funded from the amount paid by the investors for the policies. When an insured dies, investors in that policy collect their pro rata share of the policy's death benefit.

### B. Life Partners' Profits Depend on Short LEs

29.     According to the Company's Forms 10-K and 10-KSB filed with the Commission for fiscal years 2008 through 2010, Life Partners prices life settlements "based on the policy face amount, the anticipated life expectancy of an insured and policy maintenance costs." The policy face amount and policy maintenance costs are ostensibly fixed. But the LE is variable in that it is set by an LE underwriter that analyzes the age and health of the insured. Accordingly, the LE is a significant factor impacting both the price investors pay for policies and the revenues and profit margins that Life Partners extracts from the transactions that it brokers.

30.     Since 1999, the Company has relied exclusively on Cassidy, a Reno, Nevada-based internist, to provide LEs for the policies it brokers. Prior to 1999, Life Partners obtained the LEs it used to broker life settlements from Kelly, a founder and part owner of Life Partners, Inc. Kelly died unexpectedly in 1999. Before his death, he and Cassidy shared office space in Reno, but maintained separate medical practices.

31.     Pardo met Cassidy at Kelly's funeral, and hired him to fill Kelly's role in furnishing LEs to Life Partners. Pardo had never met Cassidy before, and, according to Pardo, never spoke to him again after their conversation at the funeral. At Kelly's funeral, Pardo directed Cassidy to review Kelly's life expectancy assessments to determine "how they were doing it." Cassidy agreed to do so, and, within days of meeting Pardo at Kelly's funeral, he was rendering LEs for Life Partners.

32.     Pardo hired Cassidy without conducting any meaningful due diligence on Cassidy's qualifications to serve as a life expectancy underwriter.  At the time Pardo hired him, Cassidy had no experience rendering LEs.  Cassidy has never had any actuarial training, and, as of February 8, 2011, had never taken any courses or received any professional guidance or instruction on life expectancy analysis.  He had never attended a life settlement conference or researched the methodology used by other underwriters in the life settlement industry.

33.     Initially, Life Partners paid Cassidy $500 for each policy Life Partners successfully brokered using Cassidy's LE.  In or around February 2008, Life Partners began paying Cassidy a $15,000 per month retainer on top of the $500 fee he received for every policy Life Partners brokered using his LE.  Since Kelly's funeral in 1999, Life Partners has sent all of its retail life expectancy work to Cassidy.  In the ten-plus years he has worked for Life Partners, Cassidy has never evaluated his track record on LEs or the reliability of his methodology, which he has never modified.

### C. Cassidy's Methodology Results in Short Life Expectancy Estimates

34.     Cassidy described his methodology in letters to the Company dated March 2002 ("2002 Letter") and May 2009 ("2009 Letter") (collectively, the "Letters").  The purpose of the Letters was to provide information to Life Partners' auditor about Cassidy's methodology.

35.     According to the 2009 letter, Cassidy was rendering LEs using a census table published by the U.S. Department of Health and Human Services ("HHS").  The HHS table is a census table that addresses life expectancies for the entire U.S. population.  In contrast, mortality tables used by actuaries in the life settlement industry address mortality rates for a select portion of the population who have been underwritten for insurance.  LE estimates based on data provided in the HHS table are typically shorter than LE estimates based on data in tables tailored

to insured populations.  Cassidy's practice of using a census table to assess life expectancy deviates from the standard practice in the life settlement industry.

36.     Cassidy also deviated from standard practices in the life settlement industry by rendering LEs based on outdated mortality data instead of the most recent data, *e.g.,* using 1999 data when 2005 data was available.

37.     Cassidy has purportedly reviewed tens of thousands of policies during his decade-plus tenure underwriting LEs for Life Partners, but before they received inquiries from the Commission's staff in 2010, neither Cassidy nor the Company ever assessed the accuracy of his LE track record.  Nor did they otherwise attempt to inform future LE estimates based on other historical experiences, such as changes in medical treatments or mortality tables.  Cassidy's failure to factor in historical experience in his LE underwriting methodology deviates from standard practice in the life settlement industry.

38.     The Letters also indicate that Cassidy's methodology for generating LEs on viaticals and senior life settlements is substantially the same.  According to Life Partners, it brokered primarily viatical policies until fiscal year 2008.

39.     As a result of these deficiencies in Cassidy's methodology, his LEs are materially short, and the number of policies brokered by Life Partners for which the insured has exceeded Cassidy's LE has increased over time.  The actual number of maturities on policies underwritten by Life Partners is significantly lower than the expected number of maturities (based on Cassidy's LEs) for those same policies, for both viaticals and life settlements.

40.     For example, the average LE generated by Cassidy for all policies from 2000-2005 was 3.8 years, and his average LE for life settlements from 2000-2010 was 4.6 years.  Had the LEs been appropriately developed based on sound actuarial practices, including factoring in

historical experience, Cassidy's average LE for all policies (including viaticals) funded from 2000 through 2005 should have been at least 8 years longer. Cassidy's average LE for life settlements funded from 2000 through 2010 should have been at least 9 years longer than estimated.

41.     Cassidy's success rate in accurately estimating LEs was abysmal. The following chart shows, for the universe of policies from which his success rate is measurable, the percentage of policies that have exceeded Cassidy's LEs since Life Partners started brokering policies based on those LEs:

| Fiscal Year | Policies Exceeding LE |
|:-----------:|:---------------------:|
| 2006 | 88% |
| 2007 | 88% |
| 2008 | 89% |
| 2009 | 90% |
| 2010 | 91% |

42.     In an effort to conceal Life Partners' practice of using Cassidy's flawed methodology to systematically underestimate LEs, and the accompanying risk that Life Partner's reliance on underestimated LEs posed to the Company's business, Peden misrepresented that Cassidy's methodology was consistent with industry practices. Peden misrepresented that Cassidy's LEs were based on the 2008 VBT, a table published by the Society of Actuaries that is widely used in the life settlement industry.

43.     In October 2008, Peden misrepresented to an investor that "the average LE is based on how old the insured is right now and what the 2008 VBT tables say your LE [is]." When he made this statement, Peden knew that Cassidy used a census table that included all persons, not a table, like the VBT, that includes data only for persons underwritten for life

insurance.  In fact, contrary to these statements, Life Partners made no use of the 2008 VBT table in its LE estimates.

44.     Similarly, in November 2008, Peden told a member of the network of independent buyers' agents that Life Partners uses to identify investors ("Licensees") that Cassidy "uses the same mortality table that 21st Services uses."  At the time that Peden made this representation, he knew that 21st Services, a well known life expectancy provider, was using the 2008 VBT Table, and that Cassidy was using the HHS table.

###### D. Using Short Life Expectancy Estimates to Broker Life Settlements Enabled Life Partners to Inflate Its Revenues

45.     Using Cassidy's materially short LEs enabled Life Partners to artificially inflate its revenues, as the Company extracted significantly more money from investors than it would have had it priced life settlements based on appropriately developed LEs.  During fiscal years 2006 through 2011, Life Partners extracted more than $400 million of revenue from the life settlement transactions it brokered.

46.     In September 2010, Peden provided to Life Partners' auditor, E&Y, a "pricing illustration" that demonstrates the importance of LEs to Life Partners' business model.  Peden based his pricing illustration on a policy that Life Partners brokered in 2010.  Under the terms of that life settlement transaction, the policy owner agreed to sell a policy with a face amount of $5 million for $1 million.  Using a 4-year LE, Life Partners marketed the policy to investors at a price of $3 million.  At the time of the closing, Life Partners deposited $800,000 of the $3 million purchase price in escrow for the purpose of funding future premium payments on the policy for the life expectancy of the insured.  In addition, Life Partners paid, from the $3 million purchase price, the investor's broker $360,000 (a 12% commission) and medical review fees to Cassidy.

47.     According to the pricing illustration, netting fees, expenses and escrowed premiums, Life Partners realized residual, net revenue of approximately $859,000 from the sale of the policy.  Using the same policy, if the LE were increased by just two years, to a 6-year life expectancy estimate, the transaction would have been unprofitable to Life Partners.  With a 6-year LE, Life Partners would have to market the same policy, if priced to achieve the same 13% investment return, at a purchase price of approximately $2.3 million.  From the $2.3 million purchase price, Life Partners would have been required to escrow $1.2 million, pay the investors' broker $279,000 (the 12% commission), and pay the policy seller $1 million.  Accordingly, with a 6-year LE, there would be no residual income from the sale for Life Partners to capture as revenue, and the transaction would have been unprofitable to the Company.

48.     From January 2000 through December 2010, Life Partners brokered approximately 2,260 life settlement transactions based on LEs provided by Cassidy.  Using appropriately developed LEs, the average projected ROI for investors in these policies would be approximately 0.4%.  Assuming that investors would have been willing to buy interests in life settlements with a 0.4% projected ROI at all, the price they would have been willing to pay for such a small return on their investment would have been substantially less.  For example, investors paid approximately $594 million for policies brokered by Life Partners using the Cassidy LE in 2009 and 2010.  Assuming a 10% return to investors and appropriately developed LEs, these policies were actually worth approximately $39 million.  Thus, by overvaluing its policies using materially short LEs, Defendants were able to extract from investors, during 2009 and 2010 alone, approximately $555 million more than they could have reasonably expected to earn using appropriately developed LEs.

### E.  Defendants Knew that Cassidy's LEs Were Materially Short

49.    Beginning at least as early as 2003, it was apparent to Life Partners' Audit Committee and Board of Directors that the LEs used by the Company to broker life settlement transactions were materially short.   In February 2003, Life Partners' auditor and Audit Committee expressed concern that that the number of maturities on the policies that the Company brokered was less than expected based on the LEs that Life Partners assigned to those policies.   In pertinent part, the Audit Committee's February 2003 quarterly report to Life Partners' Board of Directors stated:

> [D]iscussion was held regarding the small number of policies paying off during the nine months ended November 30, 2002.   Based on these discussions, the Committee recommended discussions with management about obtaining an independent review of this issue to determine whether adjustments are necessary to the Company's underwriting criteria.

Both Pardo and Peden were members of Life Partners' Board of Directors in February 2003.

50.    Despite the Audit Committee's concerns, Pardo and Peden did not attempt to review or adjust the Company's underwriting criteria or determine why Life Partners was not seeing the expected number of maturities based on Cassidy's LEs.   Indeed, neither Pardo nor Peden followed the audit committee's recommendation to conduct an independent review of Life Partners' underwriting criteria even though, according to them, they had not spoken to Life Partners' sole underwriter—Cassidy—for almost four years.

51.    In 2003, Life Partners began including data in its annual filings with the Texas Department of Insurance ("TDI") reflecting, for matured policies, the difference between Cassidy's LEs and when insureds actually died.   The reports filed by Life Partners for 2003 through 2009 reveal that insureds underlying approximately 80% of matured policies that the

Company brokered had outlived Cassidy's LEs.  The annual reports filed with TDI were prepared by the Company's legal department, which Peden oversaw.

52.     Life Partners disclosed in its periodic filings with the Commission that it advanced money to make premium payments on brokered policies when the amounts escrowed for premiums was depleted—*i.e.,* when insureds outlived their LEs, and additional premium payments came due.  The amount of premiums advanced by Life Partners increased steadily from $827,583 in fiscal year 2005 to $2,518,316 in fiscal year 2010.  During this period, Life Partners paid a total of $8,881,035 in premium advances.  Defendants knew that Cassidy's flawed methodology for estimating LEs would result in an increasing rate of escrow depletion over time, as more escrow advances became necessary to address the rising incidence of insureds outliving Cassidy's LEs, and their knowledge of the result is manifest from Defendants' filings with the Commission.

53.     In 2006, questions and concerns about the reliability of Life Partners' LEs were raised again, when an investment firm considered a potential investment in a pool of life settlements brokered by Life Partners.  The Company authorized the investment firm to conduct due diligence on Life Partners' operations.  The firm retained a due diligence consultant who concluded, in February 2006, that Life Partners had failed to analyze the accuracy of Cassidy's LEs, and that Life Partners provided no feedback to Cassidy on his track record or methodology. The consultant's report included a recommendation to Pardo and Peden that Life Partners "track, analyze, and validate" Cassidy's LEs.  Again, Pardo and Peden did not follow the recommendation to analyze Cassidy's LEs.

54.     Moreover, data available to Defendants from the Company's internal policy tracking system showed that, by at least fiscal year 2006, the LEs that Life Partners used to

broker life settlement interests were systematically and materially underestimated.   As of February 2006, tracking data revealed that, of the policies brokered by Life Partners for which the accuracy of Cassidy's LEs is measurable ("measureable policies"), insureds underlying 88% of those policies had outlived their LEs.   By February 2009, the tracking data showed that insureds under 90% of measurable policies had outlived their LEs.

55.     In 2007, the Colorado Securities Commission confronted Life Partners and its management, including Pardo and Peden, about the unreliability of Cassidy's LEs.   The Colorado Securities Commission filed an action against Life Partners, Pardo, Peden, and others alleging, among other things, that the Company's failed to disclose material facts to investors in its life settlement transactions, including "the high frequency rate in which the viators outlived life expectancies predicted by Life Partners."   Life Partners settled the suit by agreeing, with respect to investments in 524 policies, to refund the investors' money and take back their policy interests.   Company paid $10.1 million to do so, along with statutory interest of $2.7 million.

**F.   *Defendants Misled Shareholders About the Impact of Short Life Expectancy Estimates on Life Partners' Business***

56.     Notwithstanding the significance of LEs to Life Partners' profit margins, revenue, and investor demand for the Company's products, Life Partners misrepresented, as a contingent risk, the adverse impact of underestimated LEs on the Company's business.   In the Risk Factors section of each of its Forms 10-K and 10-KSB for fiscal years 2006 through 2011, the Company included the following disclosures:

| Fiscal Year End Forms 10-K | Disclosure |
|---|---|
| 2006 | *If we underestimate the average life expectancies*, our purchasers will not realize the returns they seek, demand will fall, and purchasers will invest their funds elsewhere . . . .  We cannot assure you that, *despite our experience in settlement pricing*, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or viators and life settlors, and those losses could have a material adverse effect on our business, financial condition, and results of operations.  (Emphasis added.) |
| 2007-2008 | *If we underestimate the average life expectancies and price our transactions too high*, our purchasers will not realize the returns they seek, demand may fall, and purchasers may invest their funds elsewhere . . . .We cannot assure you that, *despite our experience in settlement pricing*, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations. (Emphasis added.) |
| 2009-2010 | *If we underestimate the average life expectancies and price our transactions too high*, our purchasers will realize smaller returns, demand may fall, and purchasers may invest their funds elsewhere. . . . We cannot assure you that, *despite our experience in settlement pricing*, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums.  If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations.  (Emphasis added.) |
| 2011 | *If we underestimate the average life expectancies and price our transactions too high*, our purchasers will realize smaller returns, demand may fall, and purchasers may invest their funds elsewhere. . . . To support our pricing systems, we use life expectancy estimates from an outside practicing physician and a leading industry provider. We cannot assure purchasers that, *despite our experience in settlement pricing*, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums.  If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations.  (Emphasis added.) |

57.     Contrary to Life Partners' misleading disclosures, Defendants knew, or were reckless in not knowing, that the Company's use of materially short LEs was not a mere possibility but an existing reality.  In connection with these misleading disclosures, Defendants acknowledged the material adverse impact that underestimated LEs posed to Life Partners' business, and particularly that investor demand for the Company's life settlements could drop off, making the business unsustainable.  Yet Defendants chose to misrepresent this known and existing risk to shareholders as a mere contingency.

58.     In late 2010 and early 2011, press articles regarding Life Partners' business practices and use of underestimated LEs had a significant, negative impact on the Company's share price.  On December 16, 2010, following an article in *The Life Settlements Report* highlighting problems with Cassidy's method for estimating LEs and the fact that his practices may be inconsistent with other LE underwriters, the Company's share price dropped by over 8%.  Similarly, a January 19, 2011, article in *The Wall Street Journal*, which made public the Commission staff's investigation of Life Partners and raised questions about the accuracy of the Company's LEs, resulted in a 17% decline in the Company's share price.  As these significant declines in the Company's share prices suggest, the accuracy of the LEs that Life Partners uses is material to the Company's shareholders.

59.     In addition, Life Partners was required by Item 303 of Regulation S-K to identify in the Management Discussion and Analysis section ("MD&A") of its Forms 10-K and 10-KSB any known trends that would result in, or that were reasonably likely to result in, a material favorable or unfavorable impact on the Company's net revenue from continuing operations.  Despite the known risk that underestimated LEs posed to Life Partners' business, Defendants never disclosed the known trend of materially short LEs.

60.     Pardo and Peden reviewed and signed Life Partners' Forms 10-K and 10-KSB for fiscal years 2006 through 2010.  Martin reviewed and signed each of Life Partners' Forms 10-K for fiscal years 2008 through 2010.

## H.     *Pardo Misrepresented Investor Returns During Conference Calls with Analysts and Shareholders*

61.     In at least two quarterly conference calls following earnings announcements by the Company, analysts inquired about the average ROI for investors in Life Partners' life settlements.  In an October 2007 conference call, Pardo misrepresented that:

> Most of our clients are looking for IRRs in the 12 to 14 % range, and this is quite common.  Some will pay a little less, some a little more.  But I would say that's a fair assessment of what they are looking for and also somewhat on the conservative side of what we think they are going to actually get.

In an October 2008 conference call, Pardo misrepresented that "I think if [clients] are expecting [11-12% returns], they will not be disappointed."

62.     Contrary to Pardo's representations, as of the 2007 and 2008 conference calls, the average or mean ROI for investors since the Company started brokering life settlements was nowhere near the "conservative" 11% to 14% returns touted by Pardo.

63.     As alleged above, Pardo was fully aware of the known practice and undisclosed trend of the Company's use of materially short LEs.  Pardo later acknowledged that the information Life Partners conveyed about historic ROI for its investors did not take into account policies that remained active beyond their LE.  He also acknowledged that, for such policies, investor returns could only decline, and more so with each passing day that the policy remained active.

### THE ACCOUNTING FRAUD

64.     In fiscal year 2003, Life Partners instituted a revenue recognition practice that was inappropriate under Generally Accepted Accounting Principles ("GAAP").  The Company's practice was improper because Life Partners prematurely recognized revenue from the life settlement transactions it brokered.  In 2004, Life Partners misled its auditor about the criteria the Company used to recognize revenue, and continued to improperly recognize revenue based on ill-gotten guidance from the auditor, even though the Company knew that the guidance was based on incomplete and misleading information.

65.     Life Partners also backdated certain transactional documents to hide the Company's premature revenue recognition from its auditors, and lied to shareholders about its revenue recognition practices in various, inconsistent disclosures in public filings.  Life Partners adhered to its inappropriate practice of prematurely recognizing revenue from fiscal year 2003 through the third quarter of fiscal year 2011 (*i.e.*, period ended November 30, 2010).

66.     In addition to prematurely recognizing revenue from life settlement transactions, Life Partners also made it a policy for certain life settlements to recognize revenue in a given quarter based on events occurring after the quarter ended, which also failed to comply with GAAP.  As a result of the Company's improper revenue recognition policies, Life Partners misstated net income in its financial statements.

67.     In addition, in analyzing the carrying value of life settlements owned by Life Partners – which, in most cases, became Company-owned because Life Partners elected to acquire them to settle disputes with investors – Life Partners' used the same LEs it assigned to the policies when it originally brokered the interests, which LEs the Company knew to be

flawed.  Through its use of the same flawed and materially short LEs to assess the value policy interests on its books, the Company materially understated impairment of its assets.

68.     On November 22, 2011, the Company announced in its Form 10-K for fiscal year 2011 that it was restating financial results for fiscal years 2007 through 2010 and the first three quarters of 2011 to correct these and other accounting errors (the "Restatement").   The Restatement addresses, among other things, errors related to revenue recognition, impairment of investments in Company-owned policies, accrued liabilities, and the related tax impact, all of which Life Partners admitted had been previously "incorrectly accounted for under [GAAP]."

### A. *The Company's Life Settlement Transaction Cycle and Timely Revenue Recognition Under That Cycle*

69.     In a typical life settlement transaction brokered by the Company, Life Partners first identifies policy owners interested in selling their policies, and negotiates a potential purchase of the policies through "Seller Agreements" between the policy owners and the Company.  Upon reaching an agreement for a potential sale by the policy owners, Life Partners forwards them assignment documents covering the policies, to be returned to the Company along with executed copies of the Seller Agreement.  Peden was one of three executives who reviewed and signed Seller Agreements on behalf of the Company.

70.     Prior to the "Closing Date," Seller Agreements are non-binding and unenforceable against the policy owner.  The Seller Agreements define "Closing Date" as "the date upon which the consideration for the transaction described herein is transferred from the Escrow Agent to the Seller."  Prior to the Closing Date, neither the policy owner nor Life Partners are contractually obligated to  proceed with the sale, as each may rescind the agreement at any time and for any reason without incurring a penalty.  In fact, for a 15-day period following the Closing Date (the "Rescission Period"), the policy owner has the option to rescind his or her

agreement to sell the policy for any reason.  Moreover, death of the insured covered by the policy prior to or during the Rescission Period triggers an automatic rescission under the Seller Agreement.

71.     While it processes the Seller Agreement, Life Partners sends the medical file for the insured underlying the policy to Cassidy for his review and analysis.   Once Cassidy completes his analysis, Life Partners prepares a confidential case history for each insured, which contains Cassidy's LE.   Licensees submit reservations on behalf of interested investors to purchase specified interests in a particular policy or policies.   To secure their reservation, investors mail or wire money to the escrow agent to be used to purchase life settlements at closing, and they deliver signed, but undated, "Policy Funding Agreements" to the Company. The Policy Funding Agreement specifies the policy or policies to be purchased, the acquisition price, and the escrow arrangements for receipt and disbursement of funds.

72.     After receipt of the Policy Funding Agreement, the Seller Agreement, and the accompanying assignment documents, Life Partners forwards to the escrow agent the documents necessary for closing.  A Life Partners employee responsible for coordinating funding sends the escrow agent a closing letter that provides instructions regarding the payment of funds at closing, including the amount to be paid to the seller, the amount to be placed into escrow for future premiums, and the residual amount to be sent to the Company.  The closing of a life settlement transaction occurs when the seller gets paid – *i.e.*, on the Closing Date, as defined in the Seller Agreement.

73.     At all times relevant to the Commission's claims, Pardo, Peden, and Martin participated in and/or monitored the process by which the Company processed and recorded revenue from life settlement transactions.   Martin, as CFO and head of the Accounting

Department, was responsible for reviewing and approving the quarter-end accrual journal entry reflecting revenues, including the journal entries necessary to reflect policies that were only partially funded – *i.e.*, polices as which the Company had secured commitments from investors sufficient to purchase some, but not all, fractional interests in the policy.  Pardo and Peden monitored daily, monthly, quarterly, and annual contract activity, including contract funding status, through an internal, electronic database that holds all information related to a particular policy.

### B. Life Partners Prematurely and Improperly Recognized Revenue

74.     Prior to fiscal year 2003, Life Partners recognized revenue as of the Closing Date. In fiscal year 2003, Life Partners began recognizing revenue prior to the Closing Date and, in so doing, began recognizing revenue from life settlement transactions in a manner inconsistent with GAAP.

75.     Specifically, the Company changed its policy to recognize revenue based on: (i) the receipt date of an executed Seller Agreement; (ii) the receipt date of documents from the seller authorizing assignment of the insurance policy; and (iii) the date of the Policy Funding Agreement from an investor committed to purchasing an interest in the policy.  Upon the occurrence of the last of these three dates for a given policy, the Company recognized, for the reporting period in which the last date fell, a *pro rata* portion of the total revenue it expected to earn when it completed the sale of 100% of the interests in that policy.  For example, if the Company had received a signed Seller Agreement and assignment documents, along with Policy Funding Agreements from purchasers to acquire 2% of a policy, the Company would recognize, in that reporting period, 2% of the total revenue anticipated from that life settlement transaction.

76.     Under GAAP, revenue can be recognized only when it is both (i) realized or realizable and (ii) earned.  Revenue is "realized or realizable" when products or services (in this case, life settlements) are exchanged or readily convertible to known amounts of cash or claims to cash.  Revenues are "earned" when "the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."   Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 605-10-25, Revenue Recognition (also contained in FASB Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, paragraphs 83(a) and 83(b)).

77.     Life Partners' post-2003 revenue recognition policy is contrary to GAAP because the Company recognizes revenues prior to the Closing Date, a point before revenue becomes either (i) realized or realizable or (ii) earned.

78.      Revenue is not realized or realizable before the Closing Date because Life Partners receives no cash, and has no claim to cash, until a life settlement is purchased by investors and the policy owner/seller is paid by the escrow agent.  The policy/owner seller does not get paid until, at the earliest, the Closing Date.  Moreover, Life Partners cannot readily convert an investor's commitment to purchase a life settlement interest into cash or a claim to cash prior to delivering the corresponding interests in the underlying policy, which it cannot possibly do prior to the Closing Date.  Accordingly, prior to the Closing Date, Life Partners' revenues are neither realized nor realizable.

79.     Revenue is not earned before the Closing Date because the policy owner is not obligated to sell the policy to Life Partners prior to the Closing Date.  Life Partners' revenues do not qualify as "earned" until such time as it fully brokers the sale of 100% of a policy.  Policy owners sell their policies in a single transaction under the Seller Agreement, not on a prorated

basis, as Life Partners identifies investors interested in purchasing fractional interests in the policy. Consequently, after the Company identifies one or more interested investors in a given policy, Life Partners still has substantial continuing obligations to identify investors sufficient to purchase all the unsold interests in the policy before it becomes entitled to any portion of the proceeds from the sale. Life Partners is not entitled to any proceeds from the sale until investors purchase 100% of a policy, which does not happen until the Closing Date, at the earliest.

80.    In short, Life Partners could not properly recognize revenue prior to closing on a life settlement transaction (*i.e.*, prior to the policy owner/seller being paid) because the Seller Agreement allowed the policy owner and Life Partners to walk away from the deal at any time for any reason prior to closing.

### C. Life Partners' Disclosures to its Auditors Regarding Revenue Recognition Were Misleading

81.    In 2004, Pardo and Peden asked Life Partners' outside auditor if the Company could recognize revenue under a hypothetical scenario based on four assumptions. For its review, Pardo and Peden asked the auditor to assume that: (i) the policy owner has signed a Seller Agreement, (ii) "[n]o additional action of any kind is required on the part of either the seller, the purchasers, or Life Partners to finalize [the] transaction," (iii) investors have signed purchase documents and "funded in full the purchase price for the policies" as wells as amounts required to be escrowed for future premium payments, and (iv) the escrow agent has taken steps necessary to ensure that the insurance carrier is legally obligated to transfer ownership of the policy.

82.    Despite their knowledge of the policy owner's rescission rights under the Seller Agreement, Pardo and Peden omitted those known contingencies from the hypothetical scenario they asked the auditor to consider. Due to the omission, the hypothetical was incomplete, and

therefore misleading.  Based on the incomplete and misleading hypothetical, the auditor advised the Company in January 2004 that it could recognize revenue under the circumstances presented.

83.     Moreover, the auditor's 2004 guidance was based on unfounded assumptions. Pardo and Peden asked the auditor to assume that investors "had funded in full the purchase price for the policies" and that "[n]o additional action of any kind is required on the part of either the seller, the purchasers, or Life Partners to finalize [the] transaction."   These assumptions presuppose that Life Partners had identified a sufficient number of investors to purchase 100% of the interests in a given policy.  As adopted by Pardo and Peden, and implemented by Martin, the Company's revenue recognition policy was inconsistent with the 2004 guidance in that Life Partners recognized revenue after identifying investors sufficient to purchase as little as 2% of a given policy, a point after which substantial additional steps were required to finalize the transaction.  Namely, finding enough investors to purchase the remaining 98% of the policy.

84.     In an April 2010 memorandum addressed to Martin and others, Pardo and Peden memorialized Life Partners' improper revenue recognition policy, described in paragraphs 76 and 82 above.  Pardo and Peden sent the memo to Martin, the Company's CFO, to codify policies and procedures that, according to Pardo and Peden, Life Partners had "regularly utilized" since they obtained the January 2004 guidance from the Company's auditor.  The memorandum also contemplated that the Accounting Department, which Martin oversaw, "may audit and test" revenue recognition qualifications for a given reporting period by verifying the receipt of Seller Agreements and assignment forms, and the dates of the Policy Funding Agreements.

85.     For fiscal year end 2010 through the third quarter of 2011, Pardo, Peden, and Martin signed management representation letters to the Company's auditor dated May 12, 2010,

July 8, 2010, August 31, 2010, and January 10, 2011, falsely stating that Life Partners had adequately disclosed a description of the revenue recognition policies that the Company applied to major revenue-generating products, which products include life settlements.

86.     These management representation letters also stated:

> All revenue recognized as of the balance sheet date has been realized and earned.  Revenue has not been recognized before (1) persuasive evidence of an arrangement exists, (2) goods have been delivered or services rendered, (3) consideration to be received is fixed or determinable and (4) collectability is reasonably assured.

The representation that all revenue recognized has been realized and earned is false for the reasons stated in paragraph 75 through 80 above.  Additionally, the lack of an obligation on the policy owner's behalf to sell the policy prior to the Closing Date indicates an absence of persuasive evidence that an arrangement exists.  Finally, prior to the Closing Date, the Company has not delivered policy interests to investors, and collectability of the Company's receivables is not reasonably assured.  Collectability cannot be assured until such time as the seller has been paid and the policy interests are delivered to the investors, which cannot occur prior to closing.

### D. In Public Filings, Life Partners Misrepresented the Company's Revenue Recognition Policies and Practices

87.     In Life Partners' experience, policy owners periodically cancelled the Seller Agreement prior to closing.  Additionally, insureds occasionally died within the Rescission Period, triggering automatic rescissions of Seller Agreements.  Life Partners' practice of prematurely recognizing revenue caused Life Partners to reverse in subsequent quarters revenues reported in previous quarters.  There were 18 such reversals affecting 20 of the 27 quarters during the period from fiscal year 2005 through the third quarter of fiscal year 2011.  Five of these reversals took place during Martin's tenure as CFO.

88.     Pardo, Peden, and Martin were aware of periodic cancellations and rescissions of Seller Agreements, which exposed the impropriety of Life Partners' revenue recognition practices.  Pardo, Peden, and Martin knew, or should have known, that it was improper for the Company to recognize revenue prior to the Closing Date.

89.     Life Partners' revenue recognition practices, which Pardo and Peden established, and Martin implemented after he became CFO, were inconsistent with the Company's disclosures to shareholders in public filings signed by Pardo, Peden, and Martin.

90.     The Company's Forms 10-K and 10-KSB for fiscal years 2006 through 2010 contain two essentially identical descriptions of the Company's revenue recognition policy, both of which were false.  In these disclosures, the Company stated that it recognizes revenue "*at the time a settlement closes [has been closed] and the purchaser has obligated itself to make the purchase.*"  (Emphasis added.)  The Company's Forms 10-Q for fiscal years 2009 and 2010 also contain this false description.

91.     Contrary to these disclosures, Life Partners routinely recognized revenue from a particular life settlement transaction before the transaction closed.  While the Seller Agreement (Life Partners' own document) defines the "Closing Date" as the date upon which "consideration for the transaction described herein is transferred from the Escrow Agent to Seller," it was Life Partners' practice to recognize revenue well before that point.

92.     Life Partners' Forms 10-Q and 10-QSB for fiscal years 2007 and 2008 contain another false description of the Company's revenue recognition policy.  In that description, the Company recognizes income from life settlement transactions "*at the time a purchaser has accepted a tendered settlement and is contractually obligated to make payment.*"  (Emphasis added.)  These disclosures to shareholder are false because the Company's revenue recognition

policy allowed it to recognize revenue before the purchaser becomes contractually obligated to make a payment.  That obligation can arise only after closing for a particular transaction.

93.     Specifically, investors are not obligated to make a payment from escrow to purchase a fractional interest in a particular policy until the policy owner is obligated to sell the policy.  Under the terms of the Seller Agreement, the policy owner is not obligated to sell the policy until closing.  Prior to that date, there is nothing for the investor to purchase.  Consequently, investors are not obligated (contractually or otherwise) to purchase the policy until closing.  Because the Company's revenue recognition policy allowed it to recognize revenue prior to closing – before investors become contractually obligated to make payments – the disclosures in the Company's Forms 10-Q and 10-QSB for fiscal years 2007 and 2008 were false.

94.     The Company's Forms 10-Q for fiscal year 2011 state a fourth false description of its revenue recognition policy.  The Forms 10-Q state that the Company recognizes revenue from life settlement transactions "upon the receipt of executed contracts and assignment document, and when the sellers have obligated themselves to transfer title of policies."  This description is false because the seller is not obligated to sell a policy and, therefore, transfer title, until the closing, but it was the Company's practice to recognize revenue before closing.

95.     On November 22, 2011, in the Restatement, the Company announced  that it was changing the date of revenue recognition from the date that purchasers commit to buy policies to the date that policy closings are funded (*i.e.,* the Closing Date).

### E. Life Partners Backdated Certain Transactional Documents to the Month the Company Received the Seller Agreement

96.     In an effort to conceal its improper revenue recognition practices from its auditor, Life Partners routinely backdated certain transactional documents underlying the Company's life settlements.  Unbeknownst to the Company's auditor, the Company's practice was to backdate closing letters, which instructed the escrow agent to execute a closing, to coincide with the month the Company received an executed Seller Agreement from the policy owner.  In many instances, the Company received executed Seller Agreements from policy owners weeks or months before the actual Closing Date for a particular transaction.  By backdating closing letters, which cued the Closing Date, the Company made it appear as though, for certain transactions, the Company's criteria for revenue recognition had been met around the time of the actual closing, which was not the case.

97.     Life Partners' practice of backdating closing letters hindered the Company's auditor's ability to evaluate when the closing for a particular transaction actually occurred versus when the Company recognized revenue from that transaction.  Through the practice, Life Partners concealed from its auditor repeated instances in which the Company's revenue recognition policy, as applied by the Company, was inconsistent with GAAP.  Closing letters containing accurate dates would have alerted the auditor that adherence to the Company's revenue recognition policy permitted the Company to recognize revenue prematurely, for transactions that did not close until months or weeks after the Company's criteria had been met.

98.     The Company also routinely backdated Policy Funding Agreements to coincide with the month that the Company received an executed Seller Agreement.  As alleged in paragraph 71 above, investors purchased life settlement interests under the terms set forth in the

Company's Policy Funding Agreements. The agreements consist of two pages, with the date and purchase terms printed on the first page and the investor signature on the second page.

99.     At all times relevant to the Commission's claims, it was Life Partners' practice to collect and maintain executed, but undated, signature pages for Policy Funding Agreements in a filing cabinet. The Company received, through its Licensees, signature pages from investors before such time as the investors had made a decision as to which or how much of a policy the investors wanted to buy. When the investors made these decisions, the Company would complete the first page of the Policy Funding Agreement, which set forth purchase terms based on which and how much of the policy the investor had elected to purchase. At the same time, the Company stapled the investor's undated signature pages to the first page of the Policy Funding Agreement, and inserted a date in the first page that coincided with the month it had received the executed Seller Agreement for the interests the investor had elected to purchase.

100.     As a result of this practice, and despite the fact that the date of the Policy Funding Agreement constituted one of the Company's three criteria for revenue recognition, the date reflected on the Policy Funding Agreement was not the date the investor "signed" the agreement or reserved an interest in a given policy. Rather, the date Life Partners selected for the Policy Funding Agreement – a date in the month that the Company received an executed copy of the corresponding Seller Agreement – could have been and, in some instances was, weeks or months prior to either of these events.

101.     The Company's practice of backdating Policy Funding Agreements hindered its auditor's ability to evaluate whether the Company followed its own revenue recognition policy. By backdating Policy Funding Agreements to a date in the month it received Seller Agreements from the owner of the policy that investors had agreed to buy, the Company made it appear as

though all three of its internal criteria for revenue recognition occurred in or around the same month, and that that point in time coincided with the date the Company recognized revenue from a particular transaction.   In reality, the Company was recognizing revenue before the final criteria of its stated policy had been met – *i.e.*, before the date of the Policy Funding Agreement from an investor committed to purchasing a life settlement interest.

102.    The Company's practice of backdating Policy Funding Agreements also interfered with its auditor's ability to determine whether the Company's revenue recognition policy was consistent with GAAP.   Had Policy Funding Agreements reflected their true execution dates, the Company's auditors would have seen that, in many instances, the Company recognized revenue before such time as investors had committed to purchase any interest, much less the totality of the interests, in a policy.   Revenue from life settlement transactions was neither realized nor realizable nor earned before such time.

103.    In a December 2006 email, the Company employee responsible for coordinating the funding of policies explained to a Licensee the reason Life Partners backdated Policy Funding Agreements.  The Funding Coordinator's email explained that she had finished the paperwork for a particular policy, including "changing the dates on the [funding status report] – you know for those who predated their [Policy Funding Agreements].  *Everything has to match for the auditors*."  (Emphasis added.)

104.    Defendants have admitted to the Commission that the dates on the Policy Funding Agreements did not reflect the dates that the agreements were signed by investors (unless the investor manually signed a date next to his signature).

105.    Defendants have also admitted that certain employees "had the ability to change the automatically generated [Policy Funding Agreement] date to match the month in which the

policy originated, and not the date of reservation.   Consequently, the [Policy Funding Agreement] date utilized by the accounting department may have reflected a date as of quarter-end even if the corresponding reservations did not occur until after the 15 business-day period after quarter end."

106.    In July 2011, Peden sent an email to Martin and others, copying Pardo, in which he explained that the Company had adopted a new document dating policy under which Policy Funding Agreements would be generated automatically to reflect the date on which an investor's reservation to purchase an interest in a policy was accepted by Life Partners and the funds on deposit had been allocated to a particular policy.   Importantly, Peden's new policy stated that "[t]hese dates cannot be edited."

107.    Finally, despite the July 2011 policy changes, Pardo, Peden and Martin failed to disclose Life Partners' backdating practices to the Company's current auditor until October 2011, over 40 days after Life Partners admitted the Company's document backdating history to the Commission.   The Company's backdating practices evidence Defendants' knowledge that Life Partners' revenue recognition practices were improper.

### C. Improper Recognition of Revenues from Transactions Occurring After Period End

108.    Apart from prematurely recognizing revenue as a matter of course, Pardo and Peden developed, and Martin implemented, a policy that authorized the Company to recognize in a given quarter revenue from events that occurred as many as 15 business days following quarter end (the "15-business-day Policy").

109.    According to an April 2010 internal accounting policy memorandum from Pardo and Peden to Martin  (the "Cutoff Memo"), the Company had a policy of "clos[ing] the books and records for a quarter on or about 15 business days after the end of the quarter."   The

Company made it a practice to keep the books and records open for purposes of recording revenues since at least fiscal year 2004.   The Cutoff Memo set a uniform period of time during which the Company kept its books and records open for revenue recognition purposes at 15 business days.  The Cutoff Memo rationalized the practice on the ground that it "allowed time for transactions conducted in the latter part of the quarter to clear and to receive bills for goods and services rendered in the latter part of the quarter."

110.    Under the 15-business-day Policy, Defendants recognized revenue from a life settlement transaction, whether that revenue was recognizable under GAAP or not, in the quarter immediately prior to the quarter in which the events on which the Company based its decision to recognize revenue had occurred.

111.    For example, if an investor committed in a Policy Funding Agreement to purchase an interest in a policy after quarter end, but prior to 15 business days into the current quarter, Life Partners recognized the pro rata revenues and costs associated with the transaction in the previous quarter.  This practice is contrary to Pardo and Peden's stated rationale for the policy, which suggested that the policy was intended only to allow the paperwork for a transaction occurring in the previous quarter to be returned to Life Partners before being recorded in the previous quarter.

112.    Through its adherence to the 15-business-day policy, Life Partners recorded revenue in a particular quarter based on events that occurred in a future quarter, which is contrary to GAAP.

113.    After the Commission's staff began its investigation of the claims underlying this lawsuit, Defendants informed the Commission's staff that the Company had decided to discontinue its practice of recognizing revenue under the 15-business-day Policy.

### D.  *The Company's Auditors Withdraw Their Audit Reports*

114.    In June 2011, E&Y sent Life Partners a letter terminating its engagement as the Company's auditor.  E&Y had served as the Company's auditor since March 2, 2010.  In addition to terminating its auditor engagement, E&Y withdrew its audit report for the Company's 2010 financial statements.

115.    E&Y's letter states that, "upon a re-examination of the Company's revenue recognition policy, we have determined that the Company should revise its revenue recognition policy.  The Company should be recording revenue at the time of the final closing of escrowed funds with the seller, unless a rescission occurs, rather than at an earlier date reflecting the purchaser's obligation to make an investment."

116.    E&Y's letter further states that, as a result of Life Partners' revenue recognition policies, "a material weakness exists relating to the recording of revenue in the proper period."  E&Y's letter continues, "[u]ntil this deficiency is remediated, there is a more than remote likelihood that a material misstatement to the annual or interim consolidated financial statements could occur and not be prevented or detected by the Company's controls in a timely manner."

117.    According to E&Y, it resigned as Life Partner's auditor due to a threat Pardo made against E&Y in a June 2011 memorandum to certain Licensees.  In the memorandum, Pardo threatened to "take action" against E&Y unless it signed off on the Company's 2011 financial statements "as is."   As a result of Pardo's threat, along with other "recent developments," E&Y concluded that it was no longer able to rely on representations from Life Partners' management, and that it was unwilling to be associated with the Company's financial statements.

118.    In a letter to the Company dated June 2011, Eide Bailly LLP ("Eide Bailly"), Life Partners' auditor from August 2008 until it resigned in January 2010, withdrew its audit report on the Company's 2009 financial statements and internal control over financial reporting.  In its letter, Eide Bailly stated that, based on the disclosures in E&Y's June 2011 letter to the Company, Eide Bailly believed "there is a possibility that the Company's consolidated financial statements as of and for the year ended February 28, 2009, may have material misstatements related to improper revenue recognition."

### E.   *Life Partners Understated Impairment of Investments in Policies*

119.    As of November 30, 2010, Life Partners has spent in excess of $18.6 million to purchase more than one thousand life settlement interests that it had previously brokered to investors.  Life Partners acquired the majority of these interests to settle disputes with investors.  For example, Life Partners acquired over half ($12.8 million) of its investments in policies to settle a lawsuit that the Colorado Securities Commissioner brought against the Company in 2007 for violations of the Colorado Securities Act.  Despite their awareness that these policies may have been impaired when acquired, Defendants failed to properly evaluate potential impairment.  As a consequence, by understating the dollar amount by which its investments in policies should have been impaired, Life Partners has overstated those investments in financial statements filed with the Commission since fiscal year 2009.

120.    Under the FASB's ASC 360-10, (formerly Statement of Financial Accounting Standards No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets), a long-lived asset shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable.  Life Partners' investments in policies are "long-lived" because Life Partners expects to hold these assets for longer than one year.  The

"carrying amount" for Life Partners' investments in policies is equal to the amount reported on its balance sheet, which represents historical cost less any previously recorded amounts of impairment.

121.    Under ASC 360-10, an impairment loss shall be recognized if the carrying amount is not recoverable and exceeds its fair value.  The carrying amount is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset.  ASC 360-10 states that an impairment loss shall be measured as the amount by which the carrying amount exceeds fair value.  Fair value is the price that would be received to sell an asset in an orderly liquidation.  For long-lived assets having uncertainties in both in timing and amounts, such as life settlements, ASC 360-10 states that "an expected present value technique will often be the appropriate technique with which to estimate fair value."

122.    Since fiscal year 2007 through at least fiscal year 2009, Life Partners has reported its investments in policies at the lesser of cost – *i.e.,* the dollar amount it spent to purchase the policies – or 75% of the face value of the policy.  Life Partners recorded the difference between cost and 75% of the face value of the policies as settlement expense.  Life Partners' practice of recording the difference as settlement expense is not consistent with either evaluation of recoverability or determination of fair value under ASC 360-10.  The practice of recording policy value at the lesser of cost or 75% of face value also evidences Defendants' awareness that Life Partners' investments in policies acquired to settle disputes may have been impaired when acquired.

123.    Life Partners disclosed in its filings with the Commission that it evaluated the carrying value of its investments in policies on a regular basis "using new or updated information

that affects our assumptions about remaining life expectancy, credit worthiness of the policy issuer, funds needed to maintain the asset until maturity, capitalization rates and potential return." Life Partners disclosed that it would recognize an impairment of individual policies "if the expected undiscounted cash flows are less than the carrying amount of the investment, plus anticipated undiscounted future premiums and capitalizable direct external costs, if any." For the fiscal years ended February 28, 2010 and 2009, Life Partners reported impairments of investments in policies of $281,882 and $151,810, respectively. For the nine months ended November 30, 2010, Life Partners reported impairments of investments in polices of $111,333.

124. From fiscal year 2009 through the period ended November 30, 2010, contrary to these disclosures, Defendants failed to appropriately evaluate and reduce the carrying value of the Company's investments in policies to fair value. In its filings with the Commission, Life Partners disclosed that impairment is "generally caused by the insured significantly exceeding the estimate of the original life expectancy, which causes the original policy costs and projected future premiums to exceed the estimated maturity value." Yet, when Defendants evaluated Life Partners' investments in policies for potential impairment, Defendants relied on the LEs Cassidy provided when the Company originally brokered interests in the policies, which Defendants knew to be materially short. As the number and percentage of insureds outliving Cassidy's LEs increased over time, this event or change of circumstances, known to Defendants, necessitated an evaluation and assessment of the reliability of Cassidy's LEs – a critical assumption in the Company's impairment analysis. Instead, the Company used the same LEs Cassidy provided at the time Life Partners originated the interests, which Defendants knew to be underestimated. As a result, the Company misled investors by materially understating impairment for its investments in life settlement policies.

125.    Despite their improper reliance on Cassidy's flawed LEs, Pardo, Peden, and Martin informed the Company's auditor at fiscal year-end 2009 of their belief that "[w]e have reviewed long-lived assets and investments in life insurance policies and tested for impairment whenever events or changes in circumstances have indicated that the carrying amount of assets might not be recoverable and have appropriately recorded the adjustment, if any."

126.    This representation was false.  Pardo, Peden, and Martin understood that the Company's impairment calculations depended on the validity of Cassidy's LEs.  They also knew, before year-end 2009, that the LEs were unreliable, and, in fact, systematically and materially underestimated

127.    In July or August 2010, E&Y requested data from Life Partners to support the LEs underlying the Company's investments in policies, and the Company's related impairment analysis.  In response, Peden and Martin submitted a chart with information on the most recent 300 maturities of viatical and life settlement policies sold by Life Partners.  According to the chart, which covered a ten-year period, the ratio of policies that matured before, versus after, the date projected by Cassidy's LEs was roughly 50%/50%.  But Peden and Martin failed to alert E&Y that, of the more than 4,000 total outstanding policies brokered by the Company that had yet to reach maturity, insureds underlying approximately 1,200 of those policies had outlived Cassidy's LE, and those policies thus failed to mature by the dates Cassidy projected.

128.    In a letter to the Company's audit committee dated May 2010, E&Y reported that it had noted control deficiencies and other matters.  E&Y considered the Company's internal control in order to design audit procedures in connection with its engagement to express an opinion on the Company's fiscal year 2010 financial statements.  E&Y reported that the Company did not have a formal process in place to assess actual-to-expected LEs.  E&Y

recommended that "[a] formal analysis, prepared quarterly, would provide management with an after the fact assessment of how accurate its initial LEs were and if any adjustments need to be made to its underwriting process."

### F. Additional Management Representation Letters to Auditors

129.    Pardo, Peden, and, for certain periods after February 2008, Martin signed management representation letters to Life Partners' auditors containing materially misleading statements and omissions.

130.    From at least fiscal year 2007 through the third quarter of fiscal year 2011, Pardo and Peden signed quarterly management representation letters to the Company's auditors dated January 15, 2007; May 25, 2007; July 16, 2007; October 12, 2007; January 14, 2008; May 14, 2008; July 9, 2008; October 9, 2008; January 9, 2009; May 29, 2009; July 10, 2009; October 9, 2009; January 11, 2010; May 12, 2010; July 8, 2010; October 8, 2010; and January 10, 2011 stating that the Company's financial statements were fairly presented in conformity with GAAP; that there were no material transactions that had not been properly recorded; and that they had no knowledge of fraud or suspected fraud involving management.

131.    Martin signed management representation letters dated May 14, 2008; July 9, 2008; October 9, 2008; January 9, 2009; May 29, 2009; July 10, 2009; October 9, 2009; January 11, 2010; May 12, 2010; July 8, 2010; October 8, 2010; and January 10, 2011, containing these representations with respect to financial statements starting at fiscal year-end 2008 through the third quarter of 2011.

### G. *Restatement and Net Effect*

132.    As described above, on November 22, 2011, Life Partners announced, in Form 10-K for fiscal year 2011, a Restatement that addresses, among other items, errors related to revenue recognition and impairment expense for investments in Company-owned policies.

133.    The Company's Form 10-K also reported that it had "improved" the method by which it calculated impairment on investments in policies by, among other things, increasing "the amount of actuarial data to improve our methodology for estimating life expectancy."  The Company reported that, rather than relying solely on Cassidy, the Company had obtained a second LE for each insured from an industry provider, typically 21st Services, LLC.  Not surprisingly, the addition of a second, well-known LE provider resulted in increased LEs for insureds underlying life settlements brokered by the Company, and increased impairment expense in prior periods.

134.    The Restatement, as it relates to impairment of investments in policies, however, does not exclusively result from a refinement of the Company's estimation process, which, under GAAP, should be reported prospectively.  To the contrary, the Restatement, as it relates to impairment of investments in policies, is due to misuse or oversight of facts that existed at the time the previously-issued financial statements were prepared.  In particular, Defendants' misuse or oversight of facts indicating that Cassidy's LEs were materially short is what caused the Company to understate impairment of investments in policies.

135.    According to the Company's Form 10-K for fiscal year 2011, the Company also corrected errors related to deferred policy monitoring costs, accrued liabilities, certain other items, and the related tax impact.

136.   Life Partners' 2011 Form 10-K also reports Pardo and Martin's conclusion that the Company did not maintain effective internal control over financial reporting as of the start of the end of fiscal year 2011, including effective controls to ensure the existence, completeness, accuracy, valuation, and presentation of activities related to, *inter alia*, revenue recognition and impairment of investment in policies.   These internal control deficiencies, according to the Company, resulted in the aforementioned misstatements of revenue and investments in policies.

137.   The table below is based upon the Restatement and indicates that Life Partners' misstatements of net income range from negative 29% to positive 11% for fiscal years 2007, 2008, 2009, and 2010.  Similarly, the Company misstated net income for the first, second, and third quarters of fiscal year 2011 by 7%, 2%, and (78)% respectively.  The misstatements of net income resulting from prematurely recognizing revenue prior to the Closing Date and inadequate impairment of investments in policies are material to Life Partners consolidated financial statements for fiscal years 2007, 2008, 2009, 2010 and for the first, second, and third quarters of fiscal year 2011.

| | Increase (Decrease) Net Income *(Dollars in millions)* | | | |
|---|---|---|---|---|
| **Nature of Restatement Adjustment** | **Year Ended 2/28/07** | **Year Ended 2/29/08** | **Year Ended 2/28/09** | **Year Ended 2/28/10** |
| 1. Revenue based on closing date | $ 0.4 | $ (3.8) | $ 0.1 | $    (2.1) |
| 2. Impairment | -- | (0.2) | (2.2) | (1.8) |
| 3. Deferred policy monitoring costs | N/A | (1.9) | (0.7) | (0.4) |
| 4. Other[2] | (0.2) | (0.3) | 0.6 | (0.1) |
| Subtotal, pretax | 0.2 | (6.2) | (2.2) | (4.4) |
| Federal and state taxes | 0.2 | 2.0 | 0.6 | 1.1 |
| Misstatement, after tax | 0.4 | (4.2) | (1.6) | (3.3) |
| Reported net income | 3.4 | 18.8 | 27.1 | 29.4 |
| Restated net income | $ 3.8 | $ 14.6 | $ 25.5 | $ 26.1 |
| **% Misstatement, under (over) stated** | **11%** | **(29)%** | **(6)%** | **(13)%** |
| [1]  The Company's restatement of prior year financial statements includes correction of errors related to the timing of expensing executive bonuses, impairment of investments in securities, and certain other items. | | | | |

## INSIDER TRADING

138.    As set forth above, by at least fiscal year end 2006, Pardo and Peden knew, but failed to disclose to shareholders, that Life Partners systematically underestimated LEs in pricing the life settlements interests it brokered.  This was material, non-public information because, as Pardo and Peden knew, the revenues and profit margins that Life Partners reported depended on underestimated LEs.  Life Partners could not sustain revenues and profit margins at the levels it reported without the continued use of underestimated LEs.  And Life Partners could not continue to use underestimated LEs to prop up its business had it disclosed its practice of doing so, as investor demand for the life settlement interests that the Company brokers would have greatly diminished if not vanished entirely had this information been public.

139.    Based on this material, non-public information, Pardo (through an entity under his control) and Peden sold approximately $11.5 million and $300,000 of Life Partners common stock, respectively.  Pardo Family Holdings, Ltd., a wholly-owned subsidiary of the Pardo Family Trust ("Pardo Trust"), sold Life Partners stock for Pardo, the beneficial owner of the Pardo Trust, as follows:

| Date | Price | # Shares Sold | Stock Sale Proceeds |
|------|-------|---------------|---------------------|
| 2/12/2007 | $10.00 | 96,155 | $961,550.00 |
| 5/18/2007 | $17.90 | 150,000 | $2,685,000.00 |
| 6/25/2007 | $34.10 | 100,358 | $3,422.207.80 |
| 10/17/2007 | $39.00 | 5,800 | $226,200.00 |
| 10/18/2007 | $39.00 | 11,200 | $436,800.00 |
| 7/25/2008 | $26.24 | 5,723 | $150,171.52 |
| 8/11/2008 | $27.64 | 6.661 | $184,110.04 |
| 8/12/2008 | $28.31 | 3,339 | $94,527.09 |
| 9/22/2008 | $35.32 | 15,000 | $529,800.00 |
| 10/14/2008 | $35.15 | 15,000 | $527,250.00 |
| 10/30/2008 | $40.71 | 15,135 | $616,145.85 |
| 10/31/2008 | $40.01 | 9,865 | $394,698.65 |

| 11/3/2008 | $36.67 | 2,866 | $105,096.22 |
| 1/7/2009 | $42.95 | 10,000 | $429,500.00 |
| 1/8/2009 | $43.50 | 10,000 | $435,000.00 |
| 1/9/2009 | $43.43 | 14,400 | $622,082.25 |
| **Total:** | | | **$11,528,839.42** |

On June 18, 2007, Peden sold approximately $300,000 of Life Partners stock held in his name.

140.    Life Partners' systematic use of materially underestimated LEs to price the life settlement interests it brokered inflated the Company's financial condition, and, consequently, its stock price.  Pardo and Peden took advantage of this material non-public information to sell Life Partners' stock at the inflated prices.

141.    Pardo authorized and set the terms of the sale of Life Partners stock.

142.    As officers and directors of Life Partners, Pardo and Peden owed fiduciary duties, including duties of trust and confidence, to Life Partners and its shareholders.

143.    Pardo and Peden knew or were severely reckless in not knowing that the information in their possession was material and nonpublic and that their trading on the basis of the information was in breach of their duties to the Company and its shareholders.

**E.  *Salaries and Bonuses Paid to Pardo, Peden and Martin***

144.    During some of the 12-month periods following Life Partners' filing of its fraudulent Forms 10-K and 10-KSB for fiscal years 2007 through 2010, Pardo and Martin received from Life Partners the following ill-gotten gains in the form of salaries and bonuses:

| Year | Pardo | | Peden | | Martin | |
|---|---|---|---|---|---|---|
| | **Salary** | **Bonus** | **Salary** | **Bonus** | **Salary** | **Bonus** |
| 2007 | $450,000 | $15,031 | $143,113 | $ 24,843 | $       -- | $       -- |
| 2008 | $468,173 | $246,123 | $159,456 | $ 246,123 | $  8,462 | $       -- |
| 2009 | $574,838 | $383,440 | $158,062 | $ 383,907 | $112,444 | $27,429 |
| 2010 | $512,710 | $473,566 | $158,954 | $473,099 | $143,096 | $ 7,532 |

145.    Pardo and Martin have never reimbursed Life Partners for any portion of their bonuses and other incentive-based and equity-based compensation.

## FIRST CLAIM FOR RELIEF
### Violations of the Antifraud Provisions of the Securities Act
### (Section 17(a) [15 U.S.C. § 77q(a)])
### [against Defendants Life Partners, Pardo and Peden]

146.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

147.    Defendants Life Partners, Pardo and Peden, in public filings with the Commission in January and February 2007, misrepresented, failed to disclose, and/or made misleading omissions regarding the Company's revenue recognition policies.

148.    By engaging in the foregoing misconduct, Defendants Life Partners, Pardo, and Peden, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, in connection with the offer or sale of securities, knowingly or with severe recklessness, employed devices, schemes, or artifices to defraud.

149.    By engaging in the foregoing misconduct, Defendants Life Partners, Pardo and Peden also, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, in connection with the offer or sale of securities, and with negligence: (i) obtained money or property by means of  untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (ii) engaged in transactions, practices, and/or courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

150.    By reason of the foregoing, Life Partners, Pardo and Peden violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q].

## SECOND CLAIM FOR RELIEF
### Violations of Antifraud Provisions of the Exchange Act
### (Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5])
### [against Defendants Life Partners, Pardo, Peden and Martin]

151.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

152.    Defendants Life Partners, Pardo, Peden, and Martin, in public filings with the Commission from January 2007 through November 2011, knowingly or with severe recklessness, misrepresented, failed to disclose, and/or made misleading omissions regarding: (i) a material risk to the Company's business, (ii) a material trend impacting the Company's revenues, (iii) the Company's revenue recognition policies and (iv) the Company's net income.

153.    Defendants Life Partners and Pardo misrepresented historical returns to investors in life settlement interests brokered by Life Partners, and made projections about future returns that they knew to be false and/or made without having any reasonable basis on which to base the projections.

154.    Pardo (through Pardo Family Holdings) and Peden sold, for their personal benefit, approximately $11.5 million and $300,000, respectively, of Life Partners securities while in possession of material nonpublic information, namely that it was Life Partners' practice to systematically use materially short life expectancy estimates to broker life settlements, and that this practice had the effects of  artificially inflating the Company's revenues and profit margins, and creating investor demand for the life settlement interests that Life Partners brokered that would not exist but for the Company's practice of doing so.

155.    As officers and directors of Life Partners, Defendants Pardo and Peden owed fiduciary duties to Life Partners and its shareholders.  As a result, they each had a duty of trust

and confidence to not trade in Life Partners securities on the basis of material nonpublic information.  Pardo and Peden traded in the securities of Life Partners in breach of these duties.

156.    Defendants Pardo and Peden knew, or were severely reckless in not knowing, that the information in their possession was material and nonpublic and that their trading on the basis of the information was in breach of their duties.

157.    By engaging in the foregoing misconduct, Defendants Life Partners, Pardo, Peden, and Martin, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly:  (i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and courses of business which operate as a fraud or deceit upon persons, including purchasers and sellers of securities.

158.    By reason of the foregoing, Life Partners, Pardo, Peden, and Martin violated, and unless enjoined, will continue to violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

159.    Pardo, Peden and Martin knowingly or with severe recklessness provided substantial assistance to Life Partners' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

160.    By reason of the foregoing, Pardo, Peden and Martin aided and abetted Life Partners' violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of the Reporting Provisions of the Exchange Act**
**(Section 13(a) and Rules 12b-20, 13a-1 and 13a-13)**
**[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.12a-13]**
**[against Defendant Life Partners]**

161.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

162.    Defendants Life Partners, Pardo, Peden and Martin, in public filings with the Commission from January 2007 through November 2011, misrepresented, failed to disclose, and/or made misleading omissions regarding: (i) a material risk to the Company's business, (ii) a material trend impacting the Company's revenues, (iii) the Company's revenue recognition policies, and (iv) the Company's net income.

163.    By engaging in the foregoing misconduct, Life Partners, whose securities are registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78]), failed to file annual and quarterly reports (on Forms 10-K, 10-KSB, 10-Q and 10-QSB) with the Commission that were true and correct, and failed to include material information in its required statements and reports as was necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

164.    By reason of the foregoing, Life Partners violated, and unless enjoined, will continue to violate, Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

165.    Pardo, Peden and Martin knowingly or with severe recklessness gave substantial assistance to Life Partners in its violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

166.    By reason of the foregoing, Pardo, Peden and Martin aided and abetted Life Partners' violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## FOURTH CLAIM FOR RELIEF
### Violation of the Books and Records and Internal Control Provisions of the Exchange Act
### (Sections 13(b)(2)(A) and 13(b)(2)(B))
### [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B))
### [against Defendant Life Partners]

167.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

168.    By engaging in the foregoing misconduct, from January 2007 through November 2011, Life Partners, whose securities are registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l]:

- Failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and

- Failed to devise and maintain a system of internal controls sufficient to provide reasonable assurances that:  (i) transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and (ii) to maintain accountability of assets.

169.    By engaging in the foregoing misconduct, Life Partners violated, and unless enjoined, will continue to violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

170.    Pardo, Peden, and Martin knowingly or with severe recklessness provided substantial assistance to Life Partners in its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Life Partners.

171.    By reason of the foregoing, Pardo, Peden and Martin aided and abetted Life Partners' violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

172.    Pardo and Martin knowingly or with severe recklessness provided substantial assistance to Life Partners in its failure to devise and maintain a sufficient system of internal accounting controls.

173.    By reason of the foregoing, Pardo and Martin aided and abetted Life Partners' violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78(m)(b)(2)(B)].

### FIFTH CLAIM FOR RELIEF
**Circumventing or Failing to Implement Internal Controls**
**(Exchange Act Section 13(b)(5) and Rule 13b2-1)**
**[15 U.S.C. § 78m(b)(5) and 17 C.F.R. §§ 240.13b2-1]**
**[against Defendants Pardo, Peden and Martin]**

174.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

175.    By engaging in the foregoing misconduct, from January 2007 through November 2011, Defendants Pardo, Peden, and Martin violated, and unless enjoined will continue to violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] by knowingly circumventing or knowingly failing to implement a system of internal accounting controls at Life Partners, or by knowingly falsifying Life Partners' books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

176.    By engaging in the foregoing misconduct, Pardo, Peden, and Martin violated Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1] by, directly or indirectly, falsifying or

causing to be falsified, the books, records or accounts of Life Partners subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### SIXTH CLAIM FOR RELIEF
**Misrepresentations and Misconduct in Connection
with the Preparation of Required Reports
(Exchange Act Rules 13b2-2(a) and 13b2-2(b))
[17 C.F.R. §§ 240.13b2-2(a) and 240.13b2-2(b)]
[against Defendants Pardo, Peden and/or Martin]**

177.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

178.    By engaging in the foregoing misconduct during the period January 2007 through November 2011, Pardo, Peden, and Martin violated Exchange Act Rule 13b2-2(a) [17 C.F.R. §§ 240.13b2-2a] by, directly or indirectly, making, or causing to be made, materially false or misleading statements, or omitting to state, or causing another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (i) an audit, review or examination of the financial statements of Life Partners required to be made pursuant to Commission rules, or (ii) the preparation or filing of  documents or reports required to be filed with the Commission.

179.    By engaging in the foregoing misconduct, in June 2011, Pardo violated Exchange Act Rule 13b2-2(b) [17 C.F.R. §§ 240.13b2-2(b)] by directly or indirectly taking action, or directing another to take action, to coerce, manipulate, mislead, or fraudulently influence an independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of Life Partners required to be filed with the Commission while he knew or should have known that such action(s), if successful, could result in rendering Life Partners' financial statements materially misleading.

**SEVENTH CLAIM FOR RELIEF**
**Violations of Certifications Rules of the Exchange Act**
**(Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14(a)])**
**[against Defendants Pardo and Martin]**

180.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

181.    On the following dates, acting under Section 302 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 13a-14, Pardo and Martin certified Forms 10-K, 10-KSB, 10-Q, and 10-QSB on behalf of Life Partners: May 16, 2008;  July 9, 2008; October 10, 2008; January 9, 2009; May 29, 2009; July 10, 2009; October 9, 2009; January 11, 2010; May 12, 2010; July 9, 2010; October 8, 2010;  and January, 10, 2011.

182.    Further, on January 16, 2007; May 29, 2007; July 16, 2007; October 15, 2007; and January 14, 2008; acting under Section 302 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 13a-14, Pardo certified Forms 10-K, 10-KSB, 10-Q, and 10-QSB on behalf of Life Partners.

183.    Specifically, Pardo and Martin certified that they had reviewed these reports and that, based on their respective knowledge, the reports did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and, based on their knowledge, the financial statements and other financial information included in the reports, fairly presented in all material respects the financial condition, results of operation and cash flows of Life Partners of, and for, the periods presented on the reports.

184.    At the time Pardo and Martin issued these certifications they knew or were severely reckless in not knowing that the reports they certified contained untrue statements of

material facts and/or omitted to state material facts necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

185.    By reason of the foregoing, Pardo and Martin violated and unless enjoined will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14(a)] promulgate under Section 302 of the Sarbanes-Oxley Act of 2002.

## REQUEST FOR RELIEF

For these reasons, the Commission respectfully requests that the Court enter a final judgment:

a)  permanently enjoining Life Partners from violating Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

b)  permanently enjoin Pardo from violating Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 thereunder, and from aiding and abetting Life Partners' violations Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

c)  permanently enjoin Peden from violating Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1, and 13b2-2 thereunder, and from aiding and abetting Life Partners' violations Sections 10(b), 13(a), 13(b)(2)(A) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

d)  permanently enjoin Martin from violating Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 thereunder, and from aiding and abetting Life Partners' violations Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

e) ordering Defendants to disgorge all ill-gotten gains, with prejudgment interest;

f) ordering Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78uA];

g) prohibiting each Defendant, under Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)]; and

h) in a form consistent with Fed. R. Civ. P. 65(d), ordering Pardo and Martin to reimburse Life Partners for bonuses and profits they received from Life Partners stock sales, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243].

i) granting such other relief as the Court may deem just and appropriate.

Dated this 3rd day of January 2012                    Respectfully submitted,


                                                        */s/ Jason C. Rodgers*
                                                        Jason C. Rodgers
                                                        Texas Bar No. 24005540
                                                        Toby M. Galloway
                                                        Texas Bar No. 00790733
                                                        Michael D. King
                                                        Texas Bar No. 24032634
                                                        Attorneys for Plaintiff
                                                        SECURITIES AND EXCHANGE
                                                        COMMISSION
                                                        801 Cherry Street, 19th Floor
                                                        Fort Worth, TX 76102
                                                        Phone: (817) 978-3821
                                                        Fax: (817) 978-2700