UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : Civil Action No.: 1:12-cv-00033 |
| | : |
| v. | : |
| | : |
| LIFE PARTNERS HOLDINGS, INC., BRIAN D. PARDO, R. SCOTT PEDEN, AND DAVID M. MARTIN, | : |
| | : |
| Defendants. | : |

### RESPONSE TO DAVID M. MARTIN'S MOTION TO DISMISS

DATED:  April 10, 2012

Respectfully submitted,

*/s/ Jason C. Rodgers*
Jason C. Rodgers
Texas Bar No. 24005540
Toby M. Galloway
Texas Bar No. 00790733
Michael D. King
Texas Bar No. 24032634

U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-1410 (jcr)
(817) 978-4927 (fax)
Attorneys for Plaintiff Securities and Exchange Commission

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................... iii-iv

I.     INTRODUCTION ................................................................................................................1

II.    ARGUMENT ......................................................................................................................3

        A.     The Complaint Adequately Pleads Martin's Violations Under Rule 9(b). ............3

        B.     The Complaint Adequately Pleads Scienter .........................................................5

        C.     Defendants' Accounting Fraud Misrepresentations Were Highly Material .........8

        D.     The Commission is Entitled to Recover Martin's Salary and Bonuses ..............10

III.   CONCLUSION

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brandley v. Keeshan*,
   64 F.3d 196 (5th Cir. 1995) ...................................................................................6

*In re Daou System,*
   411 F.3d 1006 (9th Cir. Cal. 2005) ........................................................................8

*In re Dell Inc., Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008) ..................................................................9

*In re Discovery Zone Sec. Litig.*,
   943 F. Supp. 924 (N.D. Ill. 1996) ...........................................................................6

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000)..................................................................................10

*Lovelace v. Software Spectrum*,
   78 F.3d 1015 (5th Cir. Tex. 1996) ..........................................................................5

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................8

*In re NetSolve, Inc.*,
   185 F. Supp. 2d 684 (W.D. Tex. 2001)..................................................................4

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................................5, 7

*R2 Investments LDC v. Phillips*,
   401 F.3d 638 (5th Cir. Tex. 2005) ..........................................................................5

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).....................................................................................7

*SEC v. Blatt*,
   583 F.2d 1325 (5th Cir. 1978) ..............................................................................10

*SEC v. Jenkins*,
   718 F. Supp. 2d 1070 (D. Ariz. 2010) ..................................................................10

*SEC v. Kelly*,
   663 F. Supp. 2d 276 (S.D.N.Y. 2009).................................................................5, 9

*SEC v. Manor Nursing Centers, Inc.*,
   458 F.2d 1082 (2d Cir. 1972)..................................................................................10

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ......................................................................................9

*SEC v. Sys. Software Associates, Inc.*,
   145 F. Supp. 2d 954 (E.D. Ill 2001).......................................................................4, 7

*United States ex rel. Johnson v. Shell Oil Co.*,
   183 F.R.D. 204 (E.D. Tex. 1998)................................................................................4

*United States ex rel. Willard v. Humana Health Plan of Texas Inc.*,
   336 F.3d 375 (5th Cir. 2003) ......................................................................................5

I.      INTRODUCTION

Defendants Life Partners Holdings, Inc. ("Life Partners" or the "Company"), Brian D. Pardo, R. Scott Peden, and David Martin engaged in a protracted and multi-faceted scheme to deceive shareholders about the sustainability and profitability of Life Partners' business. Top executives Pardo and Peden started the scheme, which began no later than 2006, and Martin knowingly participated in it after he became CFO in 2008. In furtherance of the scheme, Pardo, Peden, and Martin made misrepresentations and misleading disclosures about the life expectancy estimates ("LEs") that the Company uses to price the life settlements it brokers. In particular, they misled shareholders about the risk that LE underestimation posed to demand for the Company's product, and, in turn, the sustainability of Life Partners' business.

Pardo, Peden, and Martin falsely represented that underestimated LEs posed a contingent risk, when they knew that LE underestimation was an existing and actual risk. In fact, as Defendants knew, Life Partners systematically used underestimated LEs to price life settlements in order to inflate the Company's revenues. Pardo, Peden, and Martin also failed to disclose the material trend of chronic LE underestimation in the MD&A section of Life Partners' Forms 10-K and 10-KSB. By these misrepresentations and omissions, shareholders were misled to believe that the Company could continue to capture the profit margins that it had historically realized, when in, reality, LE underestimation posed a known and existing risk to demand for the Company's life settlements, and the sustainability its revenues and business. By the fraudulent scheme, Defendants kept Life Partners' practice of systematically using underestimated LEs non-public, so that the Company could continue to use the practice to sustain its revenues and prolong its business. Martin benefitted from the scheme in that the Company's success, and his compensation, depended on it.

At the same time that Pardo, Peden, and Martin misled shareholders about the Company's business model and revenues, they engaged in an accounting fraud to make Life Partners appear more profitable than it actually was. Specifically, Pardo and Peden established, and Martin implemented, improper accounting practices to accelerate revenue recognition and overstate the Company's net income in financial statements Defendants filed with the Commission. They further overstated net income by using LEs they knew to be underestimated in their impairment evaluation of Company-owned life settlements. The misstatements of net income that resulted from Defendants' improper accounting practices were highly material to shareholders.

In his Motion to dismiss, Martin claims that he is different from his co-defendants because he has only been part of the fraudulent scheme for the past four years. Martin joined the scheme soon after starting with the Company in 2008. In Life Partner's Form 10-K for that year, he misrepresented, as Pardo and Peden had before him, Life Partners' revenue recognition policy. The policy Martin described was different from the policy the Company actually employed, which Martin knew. Martin applied the Company's improper revenue recognition policy throughout the scheme, and misrepresented it to shareholders in public filings through 2011. He continued to do so even though he knew, from rescissions of life settlement transactions, that the policy was improper. He also tried to cover up the Company's LE fraud. LEs were a crucial assumption in the Company's impairment evaluation of the policies it carried on its own books. When Life Partners' auditor requested back up to support the LEs that the Company used for its impairment analysis, Martin gave the auditor a misleading chart that downplayed the extent to which Life Partners had brokered policies based on underestimated

LEs. Martin was aware of Life Partners' track record of chronic LE underestimation, and he used the misleading chart to conceal it from the Company's auditor.

## II.     ARGUMENT

Each of the four grounds that Martin urges for dismissal is unfounded. The Commission has adequately alleged the circumstances of his fraud under Rule 9(b), and the Complaint contains detailed and extensive allegations that fully support the inference that he acted with scienter. The misrepresentations Martin made by his accounting fraud were highly material, overstating annual and quarterly net income by as much as 29% and 78%, respectively. Under the Commissions claims, it is entitled to recover Martin's salary and bonuses. The Court, therefore, should deny Martin's motion.[1]

### A.     The Complaint Adequately Pleads Martin's Violations Under Rule 9(b)

The Commission asserts violations against Martin under the antifraud provisions of the Securities and Exchange Act of 1934. The violations are based on misrepresentations and omissions in Life Partner's public filings about LE underestimation and the Company's revenue recognition practices.[2] The Commission also asserts violations against Martin for accounting fraud, based on misrepresentations of net income in the financial statements that Life Partners filed with the Commission in its quarterly and annual filings.[3] The misstatements of net income were due to improper revenue recognition practices that Defendants' employed to recognize revenue from life settlement transactions prematurely, as well as Defendants' failure to properly

---

[1] In his Motion, Martin adopts the motions to dismiss of Life Partners, Peden, and Pardo. Accordingly, the Commission incorporates its responses to those motions in this response. Where appropriate to address Martin's arguments, the Commission refers to its response to Life Partners and Peden's motion [Doc. No. 21], and cites such references as "Resp. to LP/Peden Motion, p. _."

[2] See Cplt. ¶¶ 56-57, 59-60 (LE underestimation); Cplt. ¶¶ 89-94 (revenue recognition policy); Cplt ¶ 152 (violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder based on LE underestimation and revenue recognition misrepresentations and omissions).

[3] See Cplt. ¶ 137 (identifying misstatements of net income for fiscal years 2007 through 2010 and the first three quarters of fiscal year 2011); Cplt. ¶ 152 (misrepresentations of net income violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder).

*SEC v. Life Partners Holdings, Inc, et al.*  3
Response to Martin's Motion to Dismiss

evaluate potential impairment of Company-owned life settlements.[4]

In Section IV of his Motion to Dismiss ("Motion"), Martin seeks wholesale dismissal of these claims under Rule 9(b), based on his contention that the Complaint fails to allege the "circumstances of the fraud."[5]  But the Complaint alleges the circumstance of Martin's fraud, and it does so as to him individually, contrary to his assertion that the Complaint "lumps the Defendants together."  As the Commission alleges, the misrepresentations and omissions about LE underestimation appear in Life Partners' public filings, which Martin signed and certified.  Paragraphs 56 and 59 identify the misrepresentations and omissions, as well as when and where they were made.  Paragraph 60 identifies who made them, according to which Defendants signed the filings.[6]  Paragraph 57 and 59, among other allegations in the Complaint, identify why the misrepresentations and omissions were false and misleading.  The Commission has alleged Defendants' misrepresentations of Life Partners' revenue recognition policy,[7] as well as the misstatements of net income underlying the Commission's accounting fraud claims,[8] with equal specificity, and the allegations provide all the detail required by Rule 9(b).

---

[4]  *See* Cplt. ¶¶ 66, 74-80, 108-113 (recognizing revenue prematurely due to partial revenue recognition and 15-day business Policy); Cplt. ¶¶ 119-124 (inadequate impairment).

[5]  Rule 9(b) "requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *In re NetSolve, Inc.*, 185 F. Supp. 2d 684, 692 (W.D. Tex. 2001).  *See also United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206 (E.D. Tex. 1998) ("[9(b)] is a simple rule.  The Complaint must contain the "who, what, when, where and how," of the false representation.").

[6]  Paragraphs 152 sets forth the time frame for the Commission's claims, and thus identifies the specific misrepresentations and omissions for which the Commission seeks a recovery in this action.

[7]  In accordance with Rule 9(b), details of Defendants' revenue recognition misrepresentations appear in Paragraphs 60, 89-94, 147, and 152 (who, what, where, when, how).  Paragraphs 74-84 further identify, in more detail than Rule 9(b) requires, the "how."

[8]  In accordance with Rule 9(b), details of Defendants' misrepresentations of net income, appear in Paragraphs 152 (what was misrepresented (amount), together with where, when, and how net income was misrepresented), 60 (who signed annual filings), and 89 & 94 (who signed quarterly filings). Paragraphs 74-84, 108-113 &119-127 further identify, in more detail than Rule 9(b) requires, the "how."  *See SEC v. System Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (E.D. Ill 2001) (The alleged fraud is the filing of quarterly and annual revenue statements, in violation of GAAP principles, in which the reported income from software contracts was unlikely ever to be realized. [Defendant] signed quarterly and annual statements[.]… The complaint identifies eight separate revenue statements with the month, year, and the amount of revenue reported.  The SEC has adequately plead the who, what, when, and how of the alleged fraud.").

Martin argues that the Complaint nonetheless violates Rule 9(b) on the ground that certain allegations purportedly fail to demonstrate that he was aware of LE underestimation and improper revenue recognition. Rule 9(b), however, permits state of mind to be alleged generally.[9]

### B.     The Complaint Adequately Pleads Scienter

The Commission alleges a host of facts pertaining to Martin that readily support the inference that he misled shareholders with the requisite intent under the antifraud provisions.[10] The Complaints' allegations of conscious behavior by Martin, standing alone, support the inference of scienter. While Martin did not enrich himself through stock sales, as Pardo and Peden did, he shared their motive to perpetuate the Company's financial condition by their fraudulent scheme. Life Partners' business – and, therefore, Martin's job and financial compensation – depended on it.

Martin, like Pardo and Peden, misrepresented LE underestimation as a contingent risk and failed to disclose the known trend of chronic LE underestimation with, at minimum, severe recklessness. The Commission alleges that Martin knew that the LEs the Company used to broker life settlements were systematically and materially underestimated. *E.g.*, Cplt. ¶ 126. Life Partners' track record of chronic LE underestimation was as obvious to Martin as it was to

---

[9] For state of mind, Rule 9(b) relaxes the particularity requirements for pleading fraud, and provides that "conditions of a person's mind may be alleged generally.*" United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 384 (5th Cir. 2003). In claiming that the Complaint fails to allege conscious behavior as to his role in Defendants' fraudulent scheme, Martin is really making a scienter argument. As set forth in Section II(B) of this Response, the Complaint's allegations amply support the inference that Martin acted with scienter.

[10] Scienter under the antifraud provisions is an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it*." R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. Tex. 2005) (citations omitted). "In order to adequately plead scienter, a plaintiff must set forth specific facts to support an inference of fraud." *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1018 (5th Cir. Tex. 1996). Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud, or (2) identify circumstances that indicate conscious behavior on the part of the defendant. *Id.* at 1018-19. Allegations "that a defendant "knew facts or had access to information suggesting that their public statements were not accurate" by themselves "necessarily give rise to a strong inference of fraud." *SEC v. Kelly*, 663 F. Supp. 2d 276, 286 (S.D.N.Y. 2009) (citing *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

the other Defendants. It existed when Martin joined the Company in February 2008, and persisted throughout his participation in the fraudulent scheme. Cplt. ¶¶ 8, 41, 54. Even if he had somehow resisted learning of the Company's abysmal track record, the action that the Colorado Securities Commission brought against the Company alerted Martin to chronic LE underestimation. Cplt. ¶ 9, 55.[11] As did the rising incidence of escrow depletion evident from premium advances that increased over time, as reported in public filings signed by Martin. Cplt. ¶ 52.

Martin's knowledge of chronic LE underestimation is further evident from the effort he undertook to mislead the Company's auditor. When E&Y requested LE data to determine whether the Company had adequately recorded impairment of Company-owned policies,[12] Martin gave E&Y a misleading chart that downplayed the extent to which the Company's life settlements were based on underestimated LEs. Cplt. ¶¶ 124-127.[13] LEs were a crucial assumption in the valuation of life settlements, both for investors and the Company in its impairment evaluation. Cplt. ¶¶ 4, 124. Martin used the chart to conceal the true extent of LE underestimation from the Company's auditor. Cplt. ¶ 13. Martin had the same deceptive intent when he misled shareholders about LE underestimation.[14]

---

[11] As Life Partners and Peden have shown, they did not resolve the lawsuit, which confronted them about the high frequency rate of LE underestimation, until December 2008, ten months after Martin joined the Company. *See* Appendix in Support of LP/Peden's Motion to Dismiss, Ex. F [Doc. No. 12-7].

[12] Life Partners obtained the policies to settle the suit that the Colorado Securities Commission brought against the Company in 2007. Cplt. ¶ 55.

[13] Despite the fact that Life Partners experienced an alarming rate of insureds outliving LEs for active policies, the chart deceptively limited the Company's LE track record to matured policies. Of the roughly 4,000 active policies that Life Partners had brokered at the time, insureds under 1,200 of those policies had already outlived Cassidy's LEs. The chart Martin gave E&Y, however, omitted this information. Cplt. ¶ 127.

[14] Martin denies the allegation, and asks the Court to disregard it based on inferences he seeks to draw in his favor. It is fundamental, however, that, for pleading purposes, the allegation is taken as true and inferences are construed in the Commission's favor. *Brandley v. Keeshan*, 64 F.3d 196, 198 (5th Cir. 1995). Defendants may not seek dismissal on the pleadings based on the merits of their defenses. *In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924, 935 n. 9 (N.D. Ill. 1996).

Paragraph 127, in any event, does not support the inferences Martin asks the Court to draw. It alleges that Martin tailored the data he gave E&Y to information that understated the true rate of LE underestimation.

Likewise, the Commission's allegations of conscious behavior by Martin support the inference that he committed accounting fraud. The Complaint details Martin's role as CFO and head of the accounting department in reviewing and approving quarter-end accrual journal entries reflecting revenues. Cplt. ¶¶ 25, 73, 84. Throughout his tenure with the Company, in annual and quarterly filings from 2008 through 2011, Martin misled shareholders about Life Partners' revenue recognition practices, and described them in ways that made them appear consistent with GAAP, when they were not. Cplt. ¶¶ 89-95; ¶¶ 76-80 (GAAP). The Company's revenue recognition practices, as stated by Martin, were not the practices he actually followed. Cplt. ¶ 73, 84 & 88. In addition to misleading shareholders about the Company's revenue recognition policy, Martin also falsely represented to Life Partners' auditor that the Company had adequately disclosed a description of the policy. Cplt. ¶ 85.

Martin's knowledge that Life Partners' policy was improper is readily inferable from these allegations,[15] as well as from the Complaint's allegations about rescinded life settlement transactions. Cplt. ¶ 87-88. As a result of the rescissions, Life Partners had to reverse quarterly revenues five times after Martin became CFO. *Id.* Yet Martin continued to permit the Company to recognize revenue in a manner inconsistent with GAAP and Life Partners publicly stated policy.[16]

---

Underestimation is as evident from active polices beyond LE as it is from matured policies, and Martin knew that LEs were underestimated for *at least* 1,200 of the 4,000 active policies. Underestimation as to the remaining 2,800 active policies was not yet determinable, and would not be so until the policies either matured or insureds lived beyond the Company's LEs. Consequently, the 30% ratio Martin urges to defend the chart is unsound, and does not explain away his misleading omission.

[15] *See Rothman v. Gregor*, 220 F.3d 81, 85 (2d Cir. 2000) (reversing dismissal of PSLRA claims, holding that reckless failure to follow announced accounting policy supported inference of scienter); *Novak*, 216 F.3d 300, 311 (2d Cir. 2000) (reversing dismissal of PSLRA claims, holding strong inference of scienter supported by allegations that "defendants knowingly sanctioned procedures that violated the Company's own [accounting] policy, as stated in the Company's public filings");

[16] *See SEC v. System Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (E.D. Ill 2001) (denying motion to dismiss, finding inference of scienter supported by allegations that defendants recognized revenue from contracts despite knowledge that customer sued for rescission).

As further evidence of his intent to deceive, the Commission also alleges Martin knew or was reckless in not knowing that Life Partners backdated documents to conceal improper revenue recognition from the Company's auditors. Cplt. ¶¶ 15, 96-107. As one of many deceptive acts and practices that Defendants employed to carry out their accounting fraud scheme, the Complaint's backdating allegations do not require particularized allegations of involvement by any one of Pardo, Peden, or Martin to support the inference of fraudulent intent as to each of them. "After all, books do not cook themselves."[17] Finally, Martin had a clear motive for his misconduct. By their fraudulent scheme, Defendants kept the Company's systematic use of underestimated LEs non-public, in order to prolong the practice and sustain the Company's financial condition. *See* Resp. to LP/Peden Motion, p. 4-5, 16. Given the extraordinary degree by which the practice inflated Life Partners' revenues, Martin's job, and the compensation he received from it, depended on the success of Defendants' fraudulent scheme. *See* Cplt. ¶ 144 & Request for Relief (seeking disgorgement of Martin's ill-gotten gains).

### C. Defendants' Accounting Fraud Misrepresentations Were Highly Material

By their accounting fraud, Defendants filed false financial statements with the Commission that misrepresented annual net income for fiscal years 2007 through 2010, as well as quarterly net income for the first three quarters of fiscal year 2011. Cplt. ¶ 137. The misstatements of net income that the Complaint identifies are based on Defendants' own restatement of financial results, which the Company announced in its Form 10-K for fiscal year 2011 (the "Restatement"). Cplt. ¶ 68, 137. In the Restatements, Defendants admitted overstatements of net income by percentages as high as 29% for fiscal year 2008 and a staggering 78% for the third quarter of 2011. Cplt. ¶ 137.

---

[17] *In re Daou Sys.,*, 411 F.3d 1006, 1016 (9th Cir. Cal. 2005) (quoting *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1273 (N.D. Cal. 2000)).

Net income bears directly on the Company's financial condition, and the importance of such information to shareholders is not debatable. *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980). With the Restatement, Defendants acknowledged the materiality of their misrepresentations. *See SEC v. Kelly*, 663 F.Supp.2d 276, 284 (S.D.N.Y. 2009) ("[T]he fact that AOL restated its revenues to correct for [improper revenue recognition] belies any suggestion that any misstatements or omission was not material[,]" because, under GAAP, "a restatement issues only when errors are material.").

In arguing, despite the Restatement, that Defendants' misrepresentations were not material, Martin ignores the misstatements of net income that the Complaint alleges. He focuses instead on what, according to Martin, the Restatement says about Defendants' misrepresentations of revenue. Martin overlooks that the Complaint alleges several improper accounting practices, and that Defendants engaged in these practices to misrepresent not just revenues, but also the carrying value of the Company's assets.[18] By these practices, Defendants misstated the Company's net income, and by substantial degrees. In focusing on misstatements of revenue,[19] Martin leaves unaddressed the materiality of the misrepresentations that the Commission alleges. Furthermore, Martin addresses only one aspect of Defendants' accounting fraud – the 15-day business Policy – and asks the Court to draw inferences in his favor based on what he says the

---

[18] As alleged in the Complaint, Defendants recognized revenue prematurely, in a manner inconsistent with GAAP, by recognizing partial revenue from the potential sale of fractional interests in a policy. Cplt. ¶¶ 74-80. Defendants also improperly accelerated revenue recognition under the "15-business day Policy," by recognizing revenue in a quarter based on events that occurred in a future quarter. Cplt. ¶ 108-113. Through each of these improper revenue recognition practices, Defendants misstated net income in the Company's financial statements. Cplt. ¶ 66. Apart from improper revenue recognition, Defendants further misstated net income by understating impairment of the Company's assets. Cplt. ¶ . By recording impairment of Company-owned life settlements based on LEs Defendants knew to be underestimated, they failed to evaluate potential impairment in a manner consistent with GAAP. Cplt. ¶¶ 67, 120-124, 137. In the Restatement, Defendants admitted that that revenues and impairment of assets had been previously "incorrectly accounted for under [GAAP]." Cplt. ¶ 68.

[19] Martin does not dispute materiality even as to Defendants' misstatements of net revenue. Rather, he urges that the magnitude of the revenue misrepresentations do not support the inference of scienter. The quantitative threshold for materiality, however, is much lower. *See In re Dell Inc., Securities Litig.*, 591 F. Supp. 2d 877, 904 (W.D. Tex. 2008) ("[T]o support an inference of scienter, GAAP and GAAS violations must extend in nature and magnitude beyond merely the materiality threshold.").

policy accomplished, rather than what the Complaint alleges.[20] The Court should deny the Motion on the materiality grounds Martin has asserted.[21]

### D. The Commission is Entitled To Recover Martin's Salary and Bonuses

The Commission seeks disgorgement of Martin's salary and bonuses as part of the equitable relief to which it is entitled under the claims it has asserted.[22] Cplt. ¶ 144, Request for Relief, item (e), p. 56. The Commission is also entitled, under Section 304 of the Sarbanes Oxley Act of 2002, to recover the bonuses that Life Partners paid Martin during the fraudulent scheme.[23] Martin acknowledges that he participated in an "employee bonus pool" but denies that it was incentive or equity based. Complaint alleges it was (Cplt. ¶ 145), and, at this stage of the proceeding, the allegation must be accepted as true. The 2011 Form 10K Martin cites does not support Martin's contention that the employee bonus pool was not incentive or equity based.

## III. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Motion be denied in all respects, and that it be granted leave to amend for any respect as to which the Motion is not denied.

---

[20] Martin may not do so under Rule 12(b)(6). *See supra* note 14. The policy as described by Martin is, in any event, materially misleading. Timing is independently material, as a qualitative factor, where the misrepresentations mask changes in revenue or other trends. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (noting that "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material" where the misstatement "masks a change in earnings or other trends") (quoting SAB No. 99)). Prematurely recognizing revenue in a reporting period causes misstatements for both reporting periods – the period for which the revenue was improperly recorded, as well as the period for which it should have been recorded. And, when corrected in the Restatement, the result was not a "wash" for investors, as the misstatements misled investors about the Company's true revenue trends across quarterly and annual reporting periods.

[21] "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."). *Ganino*, 228 F.3d at 162.

[22] *See, e.g., SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (the "effective enforcement of the federal securities laws requires that the SEC be able to make the violation unprofitable.").

[23] Section 304 requires an issuer's CFO to repay to the issuer any incentive compensation they receive during the twelve months following the date on which the original financial statement (giving rise to the restatement) was issued or filed with the Commission (whichever comes first), if those financial results are later required to be restated as a result of misconduct. *See, e.g., SEC v. Jenkins*, 718 F.Supp.2d 1070 (D. Ariz. 2010).

DATED:  April 10, 2012                    Respectfully submitted,

                                             ***/s/ Jason C. Rodgers***
                                             Jason C. Rodgers
                                             Texas Bar No. 24005540
                                             Toby M. Galloway
                                             Texas Bar No. 00790733
                                             Michael D. King
                                             Texas Bar No. 24032634

                                             U.S. Securities and Exchange Commission
                                             Burnett Plaza, Suite 1900
                                             801 Cherry Street, Unit #18
                                             Fort Worth, TX  76102-6882
                                             (817) 978-1410 (jcr)
                                             (817) 978-4927 (fax)
                                             Attorneys for Plaintiff Securities and Exchange Commission

## CERTIFICATE OF SERVICE

      I hereby certify that on the 10th day of April, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all counsel who have registered with the Court.  All others were served a copy via U.S. mail.

                                             ***/s/ Jason C. Rodgers***
                                             Jason C. Rodgers